William M. Bailey v. Commissioner.
Bailey v. Commissioner
Docket No. 22972.
United States Tax Court
1950 Tax Ct. Memo LEXIS 81; 9 T.C.M. (CCH) 850; T.C.M. (RIA) 50237; October 10, 1950
*81 William Wallace Booth, Esq., and Sidney B. Gambill, Esq., for the petitioner. Kalman A. Goldring, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner seeks redetermination of a deficiency of $1,467.57 in income tax for 1946. Some adjustments are not contested. The only question is whether $3,533.40 which petitioner received from William M. Bailey Company, the petitioner in a related proceeding in Docket No. 22615, is taxable in full or as a long-term capital gain. The case was heard on a stipulation of facts and other evidence. Findings of Fact The stipulated facts are hereby found. Petitioner filed a Federal income tax return on cash basis for the calendar year 1946 with the collector of internal revenue for the twenty-third district of Pennsylvania at Pittsburgh. He was employed by Carnegie Steel Company from 1900 to 1915 as office boy, stenographer, and secretary to the president; and by Midvale Steel Company from 1915 to 1919 as secretary and assistant to the president. In 1920, petitioner was an incorporator of Bailey-Lewis Company. The name was changed in 1921 to William M. Bailey Company, hereinafter called *82 the company. Petitioner has been president and a majority stockholder of the company since its organization. As of the dates indicated, the company's outstanding $50 par value common stock was held as follows: Stockholder
3-27-'42
5-5-'43
9-1-'49
Petitioner
763
763
2601
Petitioner's wife
160
160
500
Petitioner's daughters
30
30
550
Petitioner's brothers
2
2
27
Employees
160
165
507
Arthur R. Schulze
150
150
550
Others
245
250
1265
Totals
1520
1520
6000
The company has never engaged in manufacturing. From 1921 to 1926 its business consisted of selling the products of New York Blower Company, Chicago, and Vulcan Iron Works, Wilkes-Barre, Pennsylvania. On March 27, 1926, petitioner as "licensee" entered into a written agreement with Frank R. McGee and Arthur R. Schulze as "licensors," under which petitioner was granted the "exclusive right and license to make, use and sell" chimney and goggle valves for blast furnaces. The valves were protected by three United States patents issued to McGee and Schulze. Petitioner agreed to pay the licensors royalties equal to ten per cent of the "gross selling price of the patented apparatus. *83 " The licensors agreed to prosecute suits for infringement of the patents at petitioner's request, the cost of litigation to be paid by petitioner. The agreement was to continue for the full terms of the patents, unless earlier revoked by the parties, and petitioner agreed upon expiration of the patents to pay McGee and Schulze a 5 per cent commission on gross sales. By a written instrument dated November 5, 1927, reciting a consideration of $25,000 which was paid in capital stock of the company, petitioner assigned to the company his rights under the agreement of March 27, 1926. The chimney and goggle valves protected by the three McGee and Schulze patents contained four thermal expansion tubes, and were designed for installation in the hot gas main between blast furnace and dust catcher. Their basic principle of operation was the expansion of the tubes when heated by steam, causing two flanges to move apart. When the steam was shut off, the tubes contracted, and the flanges closed against the valve's plate. The company did not sell any of the fourtube valves. Its chief engineer, Andrew Bowland, prepared drawings redesigning the valves to contain only three tubes. The action *84 of the valve plate was also changed from a vertical operation to a swing from a point of suspension. The drawings were shown to McGee and Schulze. On July 31, 1928, a patent was issued to McGee covering the valve as improved. Each valve was equipped with a steel plate with one open and one closed side. The function of the plate was to permit or prevent the flow of gas through the main, depending upon which side of the plate was exposed. Plates varied from 48 to 108 inches in diameter, and would cause gas leakage unless machined to within 15/1000 of an inch of the required thickness. The company had difficulty in obtaining plates machined to this specification. At that time, plates were shaped out of solid rolled steel. While visiting Vulcan Iron Works, petitioner watched the manufacture of parts for lime kilns. The track on which kilns revolve is made from a steel section in the shape of the letter "T". Petitioner saw a "T" section rolled in a machine to form a circle, and was informed by Vulcan's superintendent that the same machine could roll a two-inch steel bar into any shape and thickness desired. The same day petitioner told Bowland of his intention to design a satisfactory *85 plate for the valve by rolling in the same manner, two two-inch steel bars. This method enabled the plate manufacturers to machine each side of the bar to within 2/1000 of an inch of the specified thickness, and resulted in a gas-tight valve. A patent covering the plate was applied for on July 31, 1931, and was issued to petitioner on February 20, 1934. Soon after they were designed, two of the plates were installed in the plants of Carnegie Steel Company and Bethlehem Steel Company. Petitioner did not receive royalties from their sale. The company has never enforced its "shop rights" to use inventions of its employees. It has a mutual understanding with its employees that it will pay them royalties of 5 per cent on any inventions of theirs that it markets. By a written agreement with Bowland dated June 27, 1933, the company agreed to pay him royalties of 5 per cent on sales of steel stove bottoms covered by his patent. This was the company's first written agreement to pay royalties to an employee or officer. In 1934, under an oral agreement, the company began to make "royalty" payments of 5 per cent to petitioner on sales of the plates covered by his patent. A written "memorandum *86 agreement" between the company and petitioner, dated April 8, 1943, provided: "The William M. Bailey Company agrees to pay William M. Bailey, Five (5%) per Cent Royalty on the net selling price of each and every Goggle Plate manufactured in accordance with his design as shown on above patent. This agreement to hold good during the life of the patent or as long as this Plate is manufactured and is sold by The William M. Bailey Company. This royalty has been paid since the patent was issued but no formal agreement was ever signed. It is now felt that some form of agreement should be prepared and signed as a protection both to the Patentee and the Company." The thermal expansion valve could not be operated successfully on gas mains smaller than 48 inches in diameter. While chief engineer of the company, Bowland began working in 1931 to design a satisfactory valve for small gas mains. On October 14, 1936, he applied for a patent on a mechanical valve for that purpose. A written agreement dated October 6, 1936, between Bowland and the company provided, in part: "In lieu of the assignment of the Patent Application of Andrew Bowland and patent when it is granted on the design of our *87 American Mechanical Goggle Valve, The William M. Bailey Company agrees to pay Andrew Bowland 3% on the net selling price of each and every valve of this design as long as it is necessary to pay F. E. Kling on his patent No. 1,334,248. After this patent is run out in 1937, The Bailey Company agrees to pay Andrew Bowland 5% on the net selling price on this valve." A written agreement of September 29, 1937, between the same parties, recited that the Kling patent had expired and that the company would thereafter pay Bowland "a royalty of 5% on the American Mechanical Goggle Valves." A United States patent on the mechanical valve, reciting that the application had been made by "Andrew Bowland * * *, assignor to William M. Bailey Company," was issued to the company on July 26, 1938. On May 1, 1936, the company agreed in writing - "* * * to pay William M. Bailey, Three (3%) per cent Royalty on the net selling price on each and every Mechanical Goggle Valve manufactured in which the Goggle Plate as covered by the above patent is used. This agreement to hold good during the life of the patent or as long as the plate is used on the Mechanical Goggle Valves and sold by the William M. *88 Bailey Company." On November 8, 1945, petitioner as "licensor" and the company as "licensee" entered into a written agreement reciting that "the Licensor is the owner of the entire right, title, and interest" in a United States and an English patent on the plate, and that "the Licensor, by oral agreement, heretofore gave the Licensee the right and license to make, use and sell apparatus embodying the inventions" protected by the patents. The stated purpose of the agreement was "to provide for the licensing by the Licensor of the Licensee to make, use and sell apparatus embodying the inventions described and claimed in said license patent and also to confirm and ratify their past oral or informal agreements, to the same effect." The agreement called for "royalties" of 5 per cent and 10 per cent on products covered by the United States and English patents, respectively, and provided in part: "(1) The Licensor hereby grants and gives the Licensee the sole and exclusive right and license to make, use and sell apparatus embodying the inventions described and claimed in the aforesaid letters patent to the full end of the terms for which such patents are granted." The company was required *89 to obtain petitioner's written consent "to assign this license or any part thereof," but was entitled to prosecute or defend at its own expense infringement suits connected with the patents. If the company declined, petitioner was authorized to prosecute and defend infringement suits. Either party could terminate the agreement on sixty days' notice "for sufficient cause, such as lack of development of designs of the Licensor to keep pace with competition, or improper conduct or neglect of business by the Licensee." The three agreements between petitioner and the company dated May 1, 1936, April 8, 1943, and November 8, 1945, were each signed twice by petitioner, as president of the company and in his individual capacity. Petitioner did not sell inventions or patents in the regular course of business. The plate covered by the patents in question is his only invention. "Royalties" accrued by the company as due to petitioner in each of the years 1934 through 1948, as compared with all other royalties due, were as follows: Petitioner
Thermal
Mechanical
All Other
Year
Valve
Valve
Royalties
1934
$ 53.50
$ 1,860.89
1935
17.83
1,207.73
1936
474.03
$ 869.84
9,346.85
1937
1,107.05
992.75
23,278.30
1938
262.20
1,305.03
10,290.42
1939
377.80
143.17
11,364.94
1940
956.84
539.96
26,861.02
1941
937.26
3,129.55
43,324.51
1942
1,277.47
4,303.25
68,606.37
1943
3,796.23
7,647.36
102,697.18
1944
1,406.12
2,781.54
50,933.35
1945
1,465.53
664.07
14,774.84
1946
1,576.03
3,660.73
20,858.36
1947
3,414.99
4,652.16
31,008.24
1948
2,762.30
10,929.85
76,082.68
*90 The company paid petitioner "royalties" aggregating $3,533.40 in 1946, which he reported in his return as a long-term capital gain. In his notice of deficiency, respondent - "determined that the amount of $3,533.40, representing royalties received by you in the taxable year and reported by you in your return as a long-term capital gain in the amount of $1,766.73, is not a longterm gain as reported but rather, is ordinary income." Opinion We are satisifed that the arrangement between petitioner and his corporation was a license and not a sale under the original oral agreements and the first reductions to writing in prior years; and we have so held in the related case of William M. Bailey Company, 15 T.C. -, promulgated this day, where the question was whether the corporation was entitled under that agreement to deduct royalty payments as license fees paid for property of which it was not the owner. Petitioner at no time contends that the final formal agreement of 1945 did any more than to incorporate the previous arrangements in a writing and to formalize them. He says in his briefs: "The assignment was formally made in writing by agreement dated November 8, 1945, in which *91 all prior oral or informal agreements were ratified and confirmed," and "The only logical conclusion is that sometime after July, 1933, petitioner orally assigned his invention to the company, which was confirmed in writing on November 8, 1945." While it is true that the 1945 agreement uses the language "make, use and sell," and that if this is the true effect of the agreement for the full term of the patent it constitutes a complete assignment, Waterman v. Mackenzie, 138 U.S. 252, nevertheless the use of particular words is not necessarily decisive as petitioner himself asserts. "The intent of the agreement governs. Parke, Davis & Co., 31 B.T.A. 427 * * *." And in Federal Laboratories, Inc., 8 T.C. 1150, where an exclusive license "to make, use and sell" was involved, it was nevertheless held that the intention of the assignor to retain title appeared unmistakably from the instrument. Here we conclude from the document as a whole, from the obvious intention of the parties to incorporate the terms of the prior oral agreements, and from the limitations placed upon the term of the assignment and upon the rights of the assignee, that what petitioner *92 granted to the corporation was something less than an outright sale of the patent. Under these circumstances, what he received was more nearly royalties than the proceeds of the sale of a capital asset, and is accordingly taxable as ordinary income. Decision will be entered for the respondent.