PARKE, DAVIS & COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62717. Promulgated October 25, 1934.

George M. Wolcott, Esq., and Robert N. Miller, Esq., for the petitioner.

Dean P. Kimball, Esq., for the respondent.

OPINION.

LEECH: The petitioner here seeks redetermination of a deficiency of $36,430 in income tax for 1929, arising from disallowance by respondent of a credit taken on account of income taxes of $70,123.64

paid for that year by petitioner to the Governments of Queensland and New South Wales, Australia. Respondent, by his answer, raised an additional issue and asked a corresponding increase in the deficiency, alleging that a sum of $612,150 received by petitioner in the taxable year under a contract covering certain patent rights, and treated by it as a return of capital, was in fact taxable income.

The first issue is disposed of by stipulation, and effect will be given thereto under Rule 50. There remains for consideration only the issue involving the receipt of the sum of $612,150. The facts in respect of this issue are stipulated and the formal stipulation filed is incorporated herein by reference as our findings of fact.

Briefly stated, the facts are that petitioner is a Michigan corporation, engaged in the manufacture of pharmaceutical products. For some time prior to 1929 petitioner and Eli Lilly & Co. were the only large manufacturers of gelatin capsules in the United States. Several years prior to 1929 the Arthur Colton Co., a manufacturer of pharmaceutical machinery, developed an invention for the making and filling of gelatin capsules. This company manufactured several of these machines and installed them in its factory and began the manufacture and sale of capsules in competition with petitioner and Eli Lilly & Co. Finally this competition became so serious that petitioner in 1929 purchased from the Arthur Colton Co. its capsule-making machinery, its filling machines, patents and patent applications, and other properties used in its capsule business. The total consideration paid by petitioner was $1,430,000, of which amount $1,224,257.72 represented the consideration paid for the patents and patent applications.

Immediately upon the acquisition of this property by petitioner it entered into a contract with Eli Lilly & Co., reading as follows:

This Agreement made this 19th day of October, 1929, by and between PARKE, DAVIS & COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Michigan with its principal office at Detroit, Michigan, hereinafter called LICENSOR and ELI LILLY & COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Indiana, with its principal office at Indianapolis, Indiana, hereinafter called LICENSEE.

WITNESSETH

WHEREAS: The LICENSOR has purchased the capsule business of the Arthur Colton Company, such purchase including all patents, patents applied for, drawings, blue prints, specifications and/or improvements of every kind or nature now existing or which may be made in the future covering machinery, appliances, apparatus and/or equipment of all kinds for the manufacture, finishing, sorting, counting, filling, sealing and/or boxing of capsules all of which is hereinafter referred to as "PATENTS", and

WHEREAS: The LICENSEE is desirous of obtaining the exclusive right, license and privilege to make and to use such "PATENTS", and to sell and lease certain

of same as hereinafter limited, and the LICENSOR is willing to grant such exclusive right, license, and privilege subject to the rights herein reserved.

Now, therefore, the said LICENSOR in consideration of the payments to be made as hereinafter mentioned, hereby sells and grants unto the said LICENSEE the exclusive right, license and privilege to manufacture and have manufactured for its exclusive use, and to use but not to sell, the inventions covered by said " PATENTS " except as in clause " Third " provided for the full term of each of same and for the additional term of any improvement on any thereof as hereinafter provided in clauses " Fourth " and " Fifth ", subject, however, to the following conditions, namely:

First: The LICENSEE shall pay to the LICENSOR for such exclusive right, license and privilege $164,287.50 at the date hereof and $149,287.50 on November 5, 1929, and $149,287.50 on December 5, 1929, and $149,287.50 on January 5, 1930, without interest.

Second: The LICENSOR reserves fully and without qualification of any kind or description the right and privilege to manufacture and to have manufactured for its exclusive use but not to sell the inventions covered by said patents; provided, however, that the LICENSOR shall not grant any other license to any other person, firm or corporation or sell or lease capsule filling and/or sealing machinery without the consent in writing of the LICENSEE.

Third: The LICENSEE shall not assign this license or any part thereof, or grant any license to any person, firm or corporation or sell or lease capsule filling and/or sealing machinery without the consent in writing of the LICENSOR. The LICENSEE shall not use said PATENTS otherwise than in accordance with this license.

Fourth: If at any time hereafter during the continuance of this license the LICENSOR shall make any further improvements in the inventions covered by said PATENTS, or the mode of using the same, or shall become the owner of any such improvements, then in every such case the LICENSOR shall forthwith communicate each such improvement to the LICENSEE and give it full information respecting the mode of using the same, and such improvement shall fall within the terms of the license as though now existing, without further consideration.

Fifth: If at any time hereafter during the continuance of this license, the LICENSEE shall make any further improvements in the inventions covered by said patents or the mode of using the same, the LICENSEE shall forthwith give the LICENSOR full information respecting each such improvement or the mode of using the same, and the LICENSOR shall thereupon become the owner of such improvements as though the same were now known and included herein. To that end the LICENSEE will execute such assignments and other documents as may be necessary and proper in carrying out this agreement.

Sixth: In case said PATENTS shall be infringed, the LICENSOR shall take all necessary proceedings to enjoin such infringement, but the cost and expenses of such proceedings shall be paid equally by the LICENSOR and the LICENSEE, and if there be any recoveries from such proceedings such recoveries will be divided equally between the parties hereto, it being understood however that there is no obligation on the part of the LICENSOR to prosecute such proceedings beyond the point of endeavoring to enjoin any infringement.

Seventh: This agreement shall be binding upon the respective successors of the LICENSOR and the LICENSEE.

The sum of $612,150, to be paid by Eli Lilly & Co. under the above agreement, was duly paid and was treated by petitioner as a return

of capital. The cost of the Colton patents and patent applications, set up on its books at $1,224,257.72, was reduced by the amount of the payment received from Eli Lilly & Co. Petitioner has since that date taken credit for depreciation upon these patents and patent applications only in the reduced amount.

Since the execution of the contract in question petitioner has billed Eli Lilly & Co. for one half of all costs in respect of the perfecting of the patent applications and filing of additional applications for patent and the latter company has paid this proportion of such expenses.

Petitioner contends that the $612,150 it received in 1929 was in payment for one-half interest in the Colton patents transferred to Eli Lilly & Co. and represented merely a return to it of one half of the amount invested by it in such patent rights. Respondent's contention is that the rights transferred to Eli Lilly & Co. amounted to merely a license to use the patents. He insists that this result of the transaction between petitioner and Eli Lilly & Co. is shown by four conditions—(a) that while the right to make and to use the invention was transferred there was not included the right to sell the invention, (b) that improvements on the invention were to belong to petitioner, (c) that petitioner alone was given the right to sue for infringement, and (d) that Eli Lilly & Co. did not receive the right to grant to others, by way of license, the right it received from petitioner.

If these four conditions represented all of the rights granted or conditions imposed by the agreement, respondent's theory would undoubtedly be well founded. The above statement of conditions, however, fails to include other and very material conditions of the agreement. It is true that a right to sell the invention or to grant to others a license was not transferred to Lilly, but petitioner by the agreement surrendered the right to exercise these privileges without Lilly's consent, so that its rights in this respect were no greater than those of the latter. Upon execution of the agreement neither had the right to sell or license without permission of the other. We do not agree with respondent's statement that improvements on the invention were to belong to petitioner. Under the agreement such improvements were to be subject to the same conditions as the original patent rights and both parties were to bear equally their cost of development and patent. It is true that petitioner retained the legal title to the patents as well as any future improvements thereon and alone could sue for their infringement, but such suit was to be for the benefit of both, its cost to be borne equally by the two and any judgment secured for the infringement was the property of the two in equal proportions. As a result of these conditions we

can see no more than the retention by petitioner of the naked legal title in the interest and for the benefit of itself and Eli Lilly & Co. as the joint owners in equal proportions of the entire beneficial interest in the patents and improvements thereon.

We are familiar with the decisions cited by respondent holding that purported assignments of patent rights which failed to grant the right to the assignee to sell the patent or license its use were in themselves only licenses. *Waterman* v. *Mackenzie*, 138 U. S. 252; *Gayler* v. *Wilder*, 51 U. S. 476; *Atwood Lock Co.* v. *Yale & Towne Mfg. Co.*, 115 Fed. 332; *Six Wheel Corporation* v. *Sterling Motor Trust Co.*, 50 Fed. (2d) 568; *Oliver* v. *Rumford Chemical Works*, 109 U. S. 75. The question presented in these cases was the right of the so-called assignee to maintain a suit for infringement which right was denied because the right to sell the patents or license their use had been retained by the assignor.

In none of the cited cases did the court have the situation here existing. The questions there presented were entirely different from the one before us for decision. The right to maintain a suit at law is often controlled by the question of the possession of the naked legal title. Here we have a question of income tax liability where legal title is of little consequence and the inquiry is as to the ownership of the beneficial interest. We are not to determine whether petitioner or Eli Lilly & Co. could maintain a suit for infringement in its own name, but merely whether petitioner, under its contract with Eli Lilly & Co., divested itself irrevocably of certain capital investments in consideration of the payment made to it by the latter company. If this is the fact, then the transaction for income tax purposes is no more than a conversion of capital.

Let us assume that by the present contract petitioner had sold for the entire cost to it not a half but its whole beneficial interest in the Colton patents, retaining the legal title for the benefit of its vendee, the latter to bring suits for infringement in petitioner's name and bear all costs of such suits. It may well be that under the decisions cited the courts would not recognize a suit brought by the vendee in its own name, but in such case the conclusion would surely follow that petitioner had sold at cost to it all for which such cost had been expended and had derived no income thereby. Legal title alone, without beneficial ownership, and held for the interest of another, is without value. The value of the patents, for which petitioner paid $1,224,257.72, was represented by the beneficial ownership therein. Unquestionably, an equitable interest in patents is subject to transfer. *Whiting* v. *Graves*, 29 Fed. Cas. 1059; *Am. Circular Loom Co.* v. *Wilson*, 198 Mass. 189; 84 N. E. 133. When it sold one

half of that interest to another, the amount received therefor was a return to that extent of its original capital outlay in the interest sold.

The fact that in the contract through which this result was reached the parties were termed " Licensor " and " Licensee " is of no consequence. *A. B. Watson*, 24 B. T. A. 466; affd., 62 Fed. (2d) 35; cf. *Heryford* v. *Davis*, 102 U. S. 235. The rights granted or surrendered determine the character of the instrument to have been an absolute conveyance of a one-half beneficial interest in the Colton patents for $612,150. We hold that only the excess of that amount over $612,128.86, petitioner's stipulated basis for the interest conveyed to Eli Lilly & Co., is taxable income to petitioner.

Included in the stipulation of facts was a statement of testimony which it was agreed would be given under oath by Horace W. Bigelow, general attorney for petitioner, if called upon to testify. Respondent stipulates that this would be the testimony given, but objects to the competency of such testimony upon the ground that it violates the rule prohibiting oral evidence to contradict the terms of a written instrument. The testimony in question is an explanation, by the witness, of the facts surrounding the execution of the instrument and the reasons for the adoption of the form of a license to cover the agreement instead of a formal assignment of conveyance of a one-half interest in the patents. We have considered carefully the question of the competency of this evidence and are of the opinion that it does not violate the parol evidence rule, but falls within the exception therefrom permitting the introduction of testimony to explain the nature of the transaction. As the Court said in *Peugh* v. *Davis*, 96 U. S. 332:

It is an established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money. That court looks beyond the terms of the instrument to the real transaction; and when that is shown to be one of security and not of sale, it will give effect to the actual contract of the parties. As the equity, upon which the court acts in such cases, arises from the real character of the transaction, any evidence, written or oral, tending to show this is admissible. The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument. * * *

We may say, however, in conclusion that the same result would have been reached by us in the absence of this testimony solely upon the conditions of the contract between petitioner and Eli Lilly & Co.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

STERNHAGEN and ADAMS concur in the result.