**KRONNER et al. v. UNITED STATES.**
No. 49512.

United States Court of Claims.
March 3, 1953.

J. Marvin Haynes, Washington, D. C., for the plaintiffs. N. Barr Miller, F. Eberhart Haynes, Oscar L. Tyree, Washington, D. C., were on the briefs.

J. H. Sheppard, Washington, D. C., with whom was Ellis N. Slack, Acting Asst. Atty. Gen., for the defendant. Lee A. Jackson and Andrew D. Sharpe, Washington, D. C., were on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

The original plaintiffs in this proceeding were Ernest E. Wemp and Lila A. Wemp, husband and wife, of Detroit, Michigan. After the hearing before a Commissioner of this court, Ernest E. Wemp died, and Lila A. Wemp and William O'Neill Kronner, as duly qualified executors of his estate, were substituted in his stead.

This suit was instituted to recover a portion of the income taxes paid by Mr. and Mrs. Wemp for the years 1943 through 1947. The income involved was received by the late Ernest E. Wemp, hereinafter referred to as Wemp, from the Borg-Warner Corporation of Detroit, Michigan, under a written agreement executed September 15, 1921, between Wemp and the Long Manufacturing Company, hereinafter referred to as Long, which company was later acquired by Borg-Warner. The subject matter of this agreement was the patent rights to Wemp's invention of a new type clutch to be utilized in motor vehicles.

The question before the court in this proceeding is whether those payments received by Wemp annually under this agreement should be taxed as ordinary income, as was done, or as receipts from the sale of a long term capital asset within the provisions of section 117 of the Internal Revenue Code, 26 U.S.C. § 117 (1946). To avail themselves of the benefits of section 117, the burden is upon the taxpayers to establish (1) that the property in question is a "capital asset" as defined in section 117, (2) that there has been a "sale or exchange" of that property, and (3) that it has been held for more than six months prior to the "sale or exchange".

The plaintiffs in their claims for refund filed with the Commissioner of Internal Revenue, and in this suit, contend that the agreement of 1921 constituted an assignment or sale of a capital asset held for a period of more than six months with the payments received thereunder representing the purchase price, and that, therefore, those payments should be taxed at the lesser capital gain rates.

The defendant contends (1) that the patent rights covered by the agreement are not a capital asset within the provisions of section 117, (2) that even if they are, the 1921 agreement was not a sale, and (3) if it be found that a sale of a capital asset has taken place, Wemp did not hold the patent rights for the time required under section 117.

The definition of "capital assets" as it appears in section 117(a) (1) reads as follows:

"*Capital Assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

The applicable regulation issued thereunder reads in part:

"Sec. 29.117–1 * * * The term 'capital assets' includes all classes of property not specifically excluded by section 117(a) (1)."

Defendant contends that the patent rights on Wemp's clutch invention are not a capital asset within the meaning of this definition because the patent rights constituted property held by Wemp for sale to customers in the ordinary course of his business. In urging that Wemp was engaged in the business of inventing, the defendant points to the fact that the clutch design was one of several created by Wemp prior to 1921, that after 1921 he spent his working hours in improving his clutch and obtaining patents thereon and that after he once began to receive payments under the 1921 agreement said payments represented his only substantial source of income.

■ Although Wemp had perfected four inventions as of 1921, the clutch design was the only one ever offered for sale, and Long was the only party Wemp ever approached. Two of his other inventions were utilized by him while operating his own business from 1903 to 1905, and the patents thereto were sold as assets of that business. His other invention proved to be commercially impractical, and the patents expired without having been used. Wemp's activity in obtaining patents on four different inventions and the selling of only one did not serve to place him in the business of buying and selling inventions and patents. Dreymann v. C. I. R., 11 T.C. 153. The patents obtained by him on the improvements to his original clutch design

subsequent to 1921 could hardly be ruled to have been properly held by him for "sale to customers in the ordinary course of his trade or business" since under the 1921 agreement, he parted with the right to make, sell and use said improved clutches.

The fact that in the years since 1921 the amounts received in exchange for his clutch patents represented the major portion of Wemp's income did not place him in the inventing business. One who sells a piece of property may receive the payments therefor over a period of years. Yet he would not, because those payments represent his only income, be held to have been engaged in the business of selling property. Such is often the case where a persons sells property held for investment purposes. Fahs v. Crawford, 5 Cir., 161 F.2d 315.

Defendant further contends in urging that Wemp was engaged in the business of inventing that all his patents secured subsequent to 1921 were not on improvements to his clutch but related to entirely different devices. In his testimony Wemp stated that all his patent applications after 1921 did not relate to improvements on his original clutch but were concerned with related parts of the motor vehicles. He explained that these devices were directed at reducing the noise level of the motor vehicles. He further stated that this problem was tied in with his clutch since the noise levels sought to be lowered were those resulting from the operation of his clutch.

We conclude, therefore, that the patent rights on Wemp's clutch which were the subject matter of the 1921 agreement were a capital asset within the meaning of section 117.

We next consider whether the 1921 agreement constituted a sale of the patent rights as contended by the plaintiffs, or a license as contended by the defendant. The following requirement appears in Section 117(a) (4):

"* * * *Long-term capital gain.* The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, * * *"

The 1921 agreement read in part as follows:

"* * * It is further agreed that the Manufacturer is hereby *granted the sole and exclusive right to manufacture, vend, sell, license or re-license, or in any wise use the apparatus covered by the inventions of the Inventor, for the life of the patent,* when issued, or any patents which may be taken in the future, as well as upon any improvements which may be made upon said invention, the intention being that if said device shall be perfected and shall be found to be practical from a manufacturing and sales standpoint, and the Manufacturer shall elect to manufacture said device, including any improvements thereon, commercially, that the exclusive right to so manufacture and vend the same or license others so to do, is hereby given to the Manufacturer." [Italics ours.]

In addition, this agreement contained provisions covering: (1) the manufacturer was to pay Wemp a sum equal to a certain percent of the selling price of the total number of the clutches sold each year, said percent varying according to the number sold; (2) patents to be obtained in the name of the inventor at the expense of the manufacturer; (3) that at such time as the clutch was proven to be commercially satisfactory Wemp was to receive the additional sum of $250.00 per month for services to be applied in introducing the clutch to the market (he was at the time of the execution of the agreement employed by Long at a salary of $250.00 per month); (4) that these salary payments were to continue until the production of the clutches reached certain totals at which time they were to cease; (5) that if the manufacturer should at any time find the production of the clutches impractical it could cancel the contract upon notice to Wemp; (6) that Long should use its best efforts in marketing the invention and upon failing to do so, Wemp upon notice could cancel the agreement; (7) that the inventor was to defend the manufacturer against any infringement suits and satisfy any judgment against the manufacturer as the result of such suits; (8) that any new inventions and patents in connection with the clutch which he should create during the life of the agreement were to be considered as part and parcel of the agreement and that the manufacturer might license others to manufacture and produce the invention, the fee for such licensing to be paid as agreed by Wemp and Long who were to divide said fee equally.

By April of 1922, the Long Manufacturing Company made its election under the agreement and began to manufacture, use, and sell the clutches. There were several amendments to this 1921 agreement to which reference will be made later.

Plaintiffs contend that the patent conferred upon Wemp the exclusive right to make, use, and sell his invention for the life of the patent. When Wemp executed the 1921 agreement, he granted all of these rights to Long and the payments received by Wemp thereunder represented the purchase price. Plaintiffs contend that the other provisions of the agreement summarized above did not operate to defeat a conveyance of all the patent rights, but that they were necessary in order to insure Wemp an equitable return for the assignment of the patent rights.

In contending that no assignment occurred, the defendant points to the failure to use words clearly denoting such in the 1921 agreement, the presence of provisions in that agreement for termination thereof, and the language employed in the amended agreements which were later executed. These factors, defendant asserts, show that it was not the intention of the parties that an assignment was to take place under the 1921 agreement, and that it is the intention of the parties which is to govern.

█ A patent confers upon the inventor the exclusive right to manufacture, use, and sell the invention for the life of the patent. 35 U.S.C. § 40 (1946) [1952 Revision 35 U.S.C.A. § 154]. In order to constitute a valid assignment the inventor must transfer all of these rights. The grant of anything less is a mere license which conveys no proprietary interest to the licensee. Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

While it is true, as defendant contends, that the intention of the parties is to govern, the best evidence of this intention is the very words used in the contract. Here Wemp had by the terms used parted with all to which his patent entitled him, *i. e.*, the right to make, use, and sell the invention for the life of the patent.

Whether the transfer of the rights under a patent is an assignment or a license is not to depend entirely upon the name by which the agreement granting the rights is called but upon the legal effect of its provisions. Kimble Glass Company v. C. I. R., 9 T.C. 183. Thus, the grant of the exclusive right to make, use, and vend the invention for the life of the patent has been held to be an assignment even though the instrument was described as a "license" and the parties were designated as "licensor" and "licensee." Myers v. Commissioner, 6 T.C. 258; Parke, Davis & Co. v. Commissioner, 31 B.T.A. 427.

Clauses in these patent agreements permitting their termination by either party upon the occurrence of stated events or conditions have been construed by the courts to be conditions subsequent so as not to defeat the sale of the patent. Lamar v. Granger, D.C., 99 F.Supp. 17; Kimble Glass Company, supra.

These provisions, as well as the others that appear in the agreement, are ones which have become peculiar to the patent field. In Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 43 S.Ct. 254, 258, 67 L.Ed. 516, the court stated:

"Patent property is the creature of statute law and its incidents are equally so and depend upon the construction to be given to the statutes creating it and them, * * *. It is not safe, therefore, in dealing with a transfer of rights under the patent law to follow implicitly the rules governing a transfer of rights in a chose in action at common law."

Recognition of this distinction must be made when construing agreements transferring patent rights. From the viewpoint of both parties, payment on a royalty basis is the only equitable method by which a fair consideration can be obtained. Provision for termination is needed on the inventor's side since it would be his only relief if the manufacturer stifled production of his invention. A like provision is required by the manufacturer since the invention may prove to be worthless. Since there is no absolute way of insuring that the device patented is completely original, the possibility of infringement is present and the manufacturer desires protection against it.

The plaintiffs in asserting that a sale occurred under the 1921 agreement rely on Myers v. Commissioner, supra, where an agreement very similar to the one here in question was present. The Tax Court in the Myers case held that the exclusive license agreement granting to the licensee the right to make, use, and sell the invention constituted a sale of the patent rights for federal income tax purposes. The Commissioner of Internal Revenue at first acquiesced in this decision (1946–1 Cum.Bull. 3), but later withdrew this acquiescence. (Mim. 6490 1950–1 Cum.Bull. 9.) As the Revenue Bill of 1950 was passed by the House of Representatives, section 117 provided that royalty payments on inventions were not to be considered as capital gains made from the sale of capital assets for tax purposes. This exclusion was struck out in the Senate, and it did not appear in the finally adopted bill, U.S.Code Cong.Serv., 1950, p. 3140. However it is not to be inferred from this, as the plaintiffs urge, that Congress has given its sanction to the proposition that in all situations wherein an inventor grants to another his patent rights with payments to be made on a royalty basis that *ipso facto* the inventor has satisfied the exchange or transfer requirement of section 117.

In Eterpen Financiera Sociedad De Responsabilidad v. United States, Ct.Cl., 108 F.Supp. 100, 104, we had before us a "license agreement" wherein the exclusive right to make, use, and vend was present, and the plaintiff contended that a sale had occurred. In that case we stated:

"* * * It is true that a license to make, use, and vend a patented device gives rise to an assignment of a patent

where the document granting such a license is consistent with a present intent by the owner to transfer the patent. If, however, there are present in the license agreement itself, or in some closely related document which must be considered a part of the same transactions, factors which expressly negative the intent to make a transfer of the patent, the transaction cannot be held the equivalent of an assignment."

We believe this to be the correct test to be applied in these situations.

In the Eterpen case the parties had executed simultaneously with the license agreement an option agreement wherein the patentee warranted that it was "the sole and exclusive owner of the entire right, title, and interest in and to all of the patents" and that it had "the full right and power to assign and transfer the same." In deciding against the taxpayer we held that the execution of this option agreement contemporaneously with the licensing contract was a factor expressly negativing any present intent to make an assignment of the patent. We stated that if the license agreement had been an assignment the words in the option contract would have become meaningless since the taxpayer would have had nothing left to convey under the option provision. Here we have no such option provision. Under his patent the Government granted Wemp the monopoly in regard to the manufacture, sale, and use of his invention for a period of 17 years. Under the patent this was all he had, and with the 1921 agreement he transferred to Long all of these rights. His granting of the "sole and exclusive right to manufacture, vend, sell, license, or relicense or in any wise use the apparatus covered by the inventions" gave rise to the assignment of the patent and there are no factors present in the provisions which follow to contradict this assignment.

During the period from 1921 to 1940 various amendments to the 1921 agreement were executed by the parties. It is the contention of the defendant that while these later instruments were not contemporaneous as was the option contract in the Eterpen case, they should be looked to as guides in establishing the intention of the parties in respect to the original agreement. We do not here decide the question as to just how much consideration must be given to subsequent acts of the parties in determining their intentions under a prior contract. We believe that it is sufficient for our purposes here to note that there are no express factors present in any of these subsequent agreements which alter in any way the exclusive right to make, use, and sell granted in the 1921 instrument. (See Finding 21.)

All cases relied on by the defendant in support of its contention that no assignment occurred here are distinguishable from our situation. In Rhodes-Hochreim Mfg. Co. v. International Ticket Scale Co., D.C., 57 F.2d 713, the agreement contained an option provision; in Kaltenbach v. United States, 66 Ct.Cl. 570, no exclusive right "to make, sell and use" phrase or like words was present; in Cleveland Graphite Bronze Co. v. Commissioner, 10 T.C. 974, while the right to make and sell was given, the right to use was not; and in Coffman v. United States, 96 F.Supp. 929, 119 Ct.Cl. 494, and Federal Laboratories v. Commissioner, 8 T.C. 1150, both of which involved the same agreement, this court in the former case held that under the Royalty Adjustment Act, 35 U.S.C.A. § 89, the question as to license or assignment was not determinative of the issue involved, and the Tax Court in the latter found that all three rights had not been granted.[1]

1. In a recent case, Bloch v. United States, 2 Cir., 200 F.2d 63, the question of the tax status of payments received under an agreement transferring patent rights was in issue. The situation there wherein the court held that the royalty payments represented taxable income received by a nonresident alien under section 211(a), 26 U.S.C. 211, must be distinguished from our case here wherein a resident citizen and section 117 are involved. The court in the Bloch case recognized such distinction in referring to a prior decision of that court, Rohmer v. Commissioner, 2 Cir., 153 F.2d 61 at page 65, where that point was set forth. In Herwig v. United States, 105 F.Supp. 384, 122 Ct. Cl. 493, we called attention to this distinction. In the Bloch case the court was governed by Commissioner v. Wodehouse,

We come now to the third and final requirement which appears in section 117. Did Wemp hold this capital asset for a period of six months prior to the assignment so that the payments received may be taxed at the rates applicable to long term capital gains? The defendant contends that he did not. It is settled law that the holding period of an invention under section 117 begins on the date on which the original invention is reduced to practical application. Diescher v. Commissioner, 36 BTA 732. The parties here are in agreement that this occurred in the fall of 1920 when Wemp first produced a working model of his new clutch. The contract with Long was executed on September 15, 1921, so that Wemp held his invention beyond the required six months. Although he first discussed his new clutch design with Long officials in September of 1920, there is nothing in the evidence which supports the defendant's contention that a binding contract was created at that time. In September of 1920, the officials of Long had merely stated that they might be interested in the clutch if Wemp could prove it to be practical from a manufacturing, engineering, and sales standpoint. (See Finding 11.) The agreement of September 15, 1921, was not executed until an examination of the design by automotive engineers reported the clutch engineeringly sound. Even then, by the very words of the agreement, Long was not to make its final election until the clutch was shown to be practical from both the manufacturing and sales viewpoint.

Kuzmick v. Commissioner, 11 T.C. 288, relied on by the defendant, is distinguishable. In that case the inventor was held to have entered into a binding agreement respecting the patent rights to his invention prior to his having reduced it to practical application. Thus, upon his perfecting a working model the rights thereto went to the assignee. Here Wemp had for many months prior to the contract reduced his design to practical application.

Defendant urges finally that as to the holding period requirement, a distinction must be made as to the payments received in connection with the original invention and those received in connection with the improved version of the clutch. Defendant contends that since under the agreement the rights to the improvements passed immediately upon their perfection, it cannot be said that Wemp held them for any period of time. In so urging, we believe that the defendant has failed to recognize an important right which the inventor acquires when he perfects his invention. This is the right to patent any future improvements which he might make. If anyone else had created an improved version of his clutch, he would not have been able to place it on the market without infringing upon Wemp's patent. In order to put it to use it would be necessary to secure Wemp's consent. This right along with the others acquired with the reduction of his clutch design to practical application were held by Wemp beyond the six months required and passed under the 1921 agreement.

We hold that the 1921 agreement was a sale of a capital asset held for more than six months, and the plaintiffs are, therefore, entitled to the benefits of section 117. Entry of judgment will be suspended pending the filing of a stipulation by the parties showing the amount due the plaintiffs.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419, where the Supreme Court ruled that it was the statutory interpretation of section 211(a) which was determinative of the issue and not whether a sale or license was present.