THORNTON G. GRAHAM AND JESSIE C. GRAHAM, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54516.    Filed June 29, 1956.

*Edmund Burroughs, Esq.*, for the petitioners.
*Frank W. Hardy, Esq.*, for the respondent.

734

OPINION.

ATKINS, *Judge:* The sole question presented is whether the amount of $48,643.73 received by the petitioner in the year 1951 from the corporation pursuant to the provisions of the contract of January 1, 1949, constitutes long-term capital gain, only one-half of which is to be taken into account in computing net income under the provisions of section 117 of the Internal Revenue Code of 1939.[1]

The respondent treated the full amount as ordinary income. Apparently he does not contend that the petitioner's interest in the patent in question was not a capital asset or that it was not held for more than 6 months. In any event, the evidence clearly shows that it did constitute a capital asset, in the hands of the petitioner, held for more than 6 months before the execution of the contract of January 1, 1949.

The respondent's position is that the agreement of January 1, 1949, did not constitute a sale of the petitioner's interest. He contends first that the transaction was not at arm's length since the petitioner and his co-owner of the patent, Matthews, owned the controlling stock interest in the corporation, and that in effect this was a device to convert ordinary income in the form of royalties into capital gain. He states that the petitioner and Matthews, by virtue of their majority stock ownership, could at any time cause the corporation to rescind or alter the contract. The respondent further contends that even if the transaction were at arm's length, the provisions of the agreement itself are insufficient to constitute the transaction a sale.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in his trade or business ;

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income ;

\* \* \* \* \* \*

(b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income :

100 per centum if the capital asset has been held for not more than 6 months ;

50 per centum if the capital asset has been held for more than 6 months.

We do not agree with the respondent's first contention. The organization of the corporation came about as a result of the suggestion of Frank D. Mason, who at first intended to himself organize and finance a corporation, to receive from petitioner and Matthews the right to grant licenses to others. When the corporation was organized in 1945 the petitioner and Matthews did contribute capital, and their combined interest amounted to 53½ per cent, but Mason also contributed capital and he and Ericson owned the remainder, 46⅔ per cent of the stock, Mason owning 43⅓ per cent. In 1945 the corporation was granted the right by the petitioner and Matthews to license others and collect royalties, but not to itself make, use, and vend the products under the patent. The corporation operated under this arrangement until January 1, 1949, when the contract in question was executed. Mason was president of the corporation and controlled its operations, and the petitioner and Matthews were but two of the five directors. Matthews never attended meetings of the board and the petitioner attended only occasionally. The same situation existed after the execu tion of the January 1, 1949, contract, including the year 1951, except that in that year Mason became the owner of the majority of the stock.

Considering that Mason and Ericson had a substantial minority interest in the corporation, not controlled by the petitioner and Matthews, we cannot conclude that the contract of January 1, 1949, was not at arm's length. By that contract the corporation, and hence Mason and Ericson indirectly as stockholders, acquired substantially more rights in the patent than had hitherto been granted. We do not believe that the petitioner and Matthews could arbitrarily, by virtue of their majority stockholdings, rescind or alter the contract. Undoubtedly the minority interest would have the right to prevent such action if it were detrimental to the corporation. Upon the basis of the whole record, we are of the opinion that the corporation was not set up or utilized by the petitioner and Matthews as a mere device to minimize taxes. It carried on a regular business. Under the circumstances it cannot be considered as their *alter ego* or agent. Such cases as *Campana Corporation* v. *Harrison*, (C. A. 7) 114 F. 2d 400, cited by the respondent, involving dealings between corporations wholly owned by the same stockholders, are not in point here. We conclude as a fact and hold that the contract of January 1, 1949, was executed and carried out by the parties acting at arm's length.

We turn to a consideration of the respondent's contention that the agreement itself is not sufficient to constitute an assignment.

It is well established that the transfer by the owner of a patent of the exclusive right to manufacture, use, and sell the patented article in a specific territory constitutes a sale of the patent, and that the question of whether an instrument constitutes an assignment or a license

does not depend upon the name by which it is called but upon the legal effect of its provisions. *Waterman* v. *Mackenzie*, 138 U. S. 252; *Kronner* v. *United States*, (Ct. Cl.) 110 F. Supp. 730; *Kavanagh* v. *Evans*, (C. A. 6) 188 F. 2d 234; *Watson* v. *United States*, (C. A. 10) 222 F. 2d 689; *Edward C. Myers*, 6 T. C. 258; *Kimble Glass Co.*, 9 T. C. 183; *Vincent A. Marco*, 25 T. C. 544, on appeal (C. A. 9) ; *Arthur C. Ruge*, 26 T. C. 138; *Halsey W. Taylor*, 16 T. C. 376; *Carl G. Dreymann*, 11 T. C. 153. Cf. *Cleveland Graphite Bronze Co.*, 10 T. C. 974, affd. (C. A. 6) 177 F. 2d 200; and *Lynne Gregg*, 18 T. C. 291, affd. (C. A. 6) 203 F. 2d 954.

Here the contract of January 1, 1949, is not in form a license. Rather, by its terms, the petitioner and Matthews did thereby "assign and transfer to the company all their right, title and interest in, to and under" the patent and any improvements thereof and any reissue "including all rights of recovery for past and future infringement," subject to prior licenses granted by the petitioner and Matthews to Hawley and Billingsley. An assignment in absolute form was executed by petitioner and Matthews and recorded in the United States Patent Office. The corporation agreed to pay to them for the rights and property assigned, the entire amount of royalties required to be paid by Hawley and Billingsley, an amount equal to recoveries for infringement as specified in section 11 of the contract, and in addition an amount equal to the sum of 30 per cent of the net royalties collected by the corporation on metal "Ventilated Awnings," and 3¾ cents per square foot of the upper surface area of all awnings used or sold by the corporation and its licensees other than metal "Ventilated Awnings."

The words of transfer used in the contract of January 1, 1949, are certainly sufficient to constitute the transaction an assignment unless there are other provisions which would negative the intent to transfer title. See *Arthur C. Ruge*, *supra*, and *Kronner* v. *United States*, *supra*.

We have set forth in the Findings of Fact various provisions of the contract, some of which the respondent contends evidence a continuing proprietary interest of the petitioner and Matthews in the patent. However, we are of the opinion that none of these provisions is inconsistent with the view that a sale was intended and accomplished. Thus, for example, provisions that the consideration to be paid is to be measured by a percentage of royalties received by the corporation, and that the contract may be canceled by the parties upon the occurrence of stated events or conditions do not defeat the sale. *Edward C. Myers*, *supra; Commissioner* v. *Hopkinson*, (C. A. 2) 126 F. 2d 406, affirming 42 B. T. A. 580; *Commissioner* v. *Celanese Corp.*, (C. A., D. C.) 140 F. 2d 339, affirming an opinion of this Court;

*Kronner* v. *United States, supra; Hofferbert* v. *Briggs,* (C. A. 4) 178 F. 2d 743; and *Allen* v. *Werner,* (C. A. 5) 190 F. 2d 840.

The respondent contends that the petitioner and Matthews did not sell their right to infringement recoveries and that they thus retained a substantial proprietary interest in the patent. He points to section 11 of the agreement, which is set forth in full in the Findings of Fact.

In Ellis, Patent Assignments (3d ed., 1955), it is stated:

Sec. 55. * * * The basic legal distinction between assignments and licenses has relation to the right or lack of right of the transferee to sue infringers in his own name without joining his transferor as party complainant. * * *

Sec. 56. * * * One test, therefore, as to whether an instrument is an assignment or a license is whether or not the transferee is given the right to maintain suit *without making the transferor a party to the suit.*

As we read section 11 of the contract, it was the intention of the parties that the corporation should have the right to sue for infringement in its own name. Thus, even though the petitioner and Matthews reserved the option, for 90 days after notification of infringement, to stand the expense of any suit and become entitled to an amount equal to recoveries, it is to be noted that the provision is that they have the right to "require Company to commence appropriate action to abate said infringement or recover damages or both," thus indicating that the two individuals did not retain the right to sue in their own names. Furthermore, if the two individuals should not exercise the option, the corporation is free to prosecute such action as it may deem appropriate at its own expense and shall be entitled to retain any amounts received. The respondent apparently is of the opinion that the right on the part of the petitioner and Matthews to an amount equal to any recoveries for infringement, in those instances where they elect to stand the expense of infringement suits, is inconsistent with the view that they have parted with all their proprietary interest in the patent. We think it is not inconsistent. It did not to any extent curtail the exclusive right granted to the corporation to make, use, and vend the invention. As we see it, any amount so received by the petitioner and Matthews would constitute a portion of the selling price of the patent. No reason is seen why the parties cannot fix the purchase price in these terms. The contract does not provide that the individuals are entitled to the recoveries as such, but that "an amount equal to the recoveries is to be paid by Company to Patentees [the petitioner and Matthews]," and that under section 8 of the contract the amount equal to the recoveries is included as *a part of the consideration* for the transaction. In this connection it is to be noted that in *Watson* v. *United States, supra,* one of the provisions of the contract obligated the patentee and assignee to act jointly in resisting infringement and fixed the manner in which damages recovered for infringement should be divided between them. The court viewed that

provision as one designed to protect and safeguard the respective rights of both parties and, citing cases, stated:

It was not intended to reserve to Watson any property or proprietary right in the invention which was at variance with an assignment to the corporation of the right to manufacture, sell, and use carts throughout the life of the patent. * * *

It is our opinion that here also the provision was not intended to reserve to the individuals any proprietary right at variance with an assignment to the corporation of the exclusive right to manufacture, sell, and use the invention throughout the life of the patent. We hold that any amount received by the petitioner as "infringement recoveries" constitutes a part of the proceeds from the sale of his interest in the patent.

The respondent also contends that the petitioner cannot avoid tax liability upon the royalties from the Billingsley and Hawley licenses as ordinary income merely by the device of permitting the corporation to collect them and pay them over as "selling price." He states that the so-called sale of these licenses, including the right to collect the royalties thereunder in exchange for the royalties collected, is no sale at all. However, the fact remains that the corporation did assume the duty and expense of collecting from Hawley and Billingsley, and we are of the opinion, from reading the whole contract, that collection of these amounts and paying them over was intended to be a part of the consideration for the whole transaction. By the contract the corporation would succeed to the right to exploit the patent in the territory covered by those licenses in the event they should ever be terminated. We conclude that it is proper to consider the amount received from these two licenses as a part of the selling price under the contract. In any event, the stipulated facts show that these were exclusive licenses granted to Billingsley and Hawley to make, use, and vend the patented article in specified territories and presumably would have constituted sales to them under the principle set forth above. If so, even though the amounts in question had been received directly by the petitioner and Matthews they would constitute long-term capital gain to them, and hence the contract in question could not properly be viewed as a device to convert royalties into capital gain.

It is also to be noted that under the agreement any licenses which may have been granted during the interim from 1945 to January 1, 1949, by the corporation under the right given to it to license others throughout the United States, were to continue in effect as licenses under rights acquired by the corporation pursuant to "this agreement." We construe this to mean that the corporation would acquire all right, title, and interest in any such licenses, along with all the other rights in the patent, and that there remained in the petitioner and Matthews no proprietary rights thereto.

The respondent relies on the case of *Switzer* v. *Commissioner*, (C. A. 6) 226 F. 2d 329, affirming an opinion of this Court. In that case individuals entered into a license agreement with their wholly owned corporation. The agreement provided that royalties which the licensee received under sublicenses thereafter granted should be transferred directly to the licensors who would reimburse the licensee for expenses incurred by the licensee in collecting the royalties. There also was a limitation on assignment of the agreement by the licensee. In subsequent correspondence with the corporation the licensors referred to "our patents." The United States Court of Appeals for the Sixth Circuit affirmed the conclusion of this Court that the various factors in that case indicated the intent on the part of the individuals not to transfer an absolute title to the corporation. The factual situation is different in the instant case, as pointed out hereinabove.

It is held that the amount received by the petitioner in 1951, pursuant to the terms of the contract of January 1, 1949, constitutes long-term capital gain to him.

*Decision will be entered under Rule 50.*