**Damiano ARRAS and Angelina Arras, Plaintiffs,**

**v.**

**The UNITED STATES of America and James P. Graham, District Director of Internal Revenue for the District of Connecticut, Defendants.**

**Civ. No. 5756.**

United States District Court
D. Connecticut.

May 30, 1958.

Carlos A. Richardson (of Camp, Williams & Richardson), New Britain, Conn., for plaintiffs.

Leland Atherton, Sp. Asst. to Atty. Gen., Hon. Simon S. Cohen, U. S. Atty., Hartford, Conn. (Charles K. Rice, Asst. Atty. Gen., James P. Garland and Richard Mulcahy, Dept. of Justice, Washington, D. C., on the brief), for defendants.

J. JOSEPH SMITH, Chief Judge.

This is an action under Section 1346 of Title 28 U.S.C. by the plaintiffs Damiano Arras and Angelina Arras, against the United States of America and the Collector of Internal Revenue for this collection district, to recover allegedly illegal tax payments made by the plaintiffs during the years 1949 through 1953 inclusive. The outcome of this case hinges on whether certain payments received by the plaintiffs during the years in question constitute income within the meaning of Section 22(a),

26 U.S.C.A. § 22(a) or capital gains within the meaning of Section 117 of the 1939 Internal Revenue Code, 26 U.S.C. (1939). Plaintiffs seek recovery on the ground that income received by taxpayer as royalties from his patent license was a long term capital gain because received for the "sale or exchange of a capital asset held for more than 6 months" under 26 U.S.C.A. § 117(a) (4).

The statutes involved are the following:

Internal Revenue Code of 1939:

"§ 22. Gross income

"(a) General definition. 'Gross Income' includes, gains, profits, and income derived from salaries, wages, or compensation for personal service, * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * *"

* * * * * *

(26 U.S.C.1952 ed. § 22.)

"§ 117 (As amended by Sec. 150 of the Revenue Act of 1942, c. 619, 56 Stat. 798, and Sec. 210(a) of the Revenue Act of 1950, c. 994, 64 Stat. 906). Capital gains and losses.

"(a) *Definitions.* As used in this chapter—

"(1) *Capital assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(B) or property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1) * * *

* * * * * *

"(4) *Long term capital gain.* The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income.

* * * * * *

"(q) (As added by Sec. 1 of the Act of June 29, 1956, c. 464, 70 Stat. 404) *Transfer of patent rights.*—

"(1) *General rule.* A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(B) contingent on the productivity, use or disposition of the property transferred.

"(2) *'Holder' defined.* For purposes of this subsection, the term 'holder' means—

"(A) any individual whose efforts created such property, or

"(B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

"(i) the employer of such creator, nor

"(ii) related to such creator (within the meaning of paragraph (3)) * * * ." (26 U.S.C.1952 ed. § 117.)

Defendants contend that plaintiffs were not "holders" of the rights in the patent and that the amounts received by them are not proceeds of the sale of the patent even if the transaction be construed as a sale, but rather amounts received by Arras, Inc., in the usual course of its business. The corporation, Arras, Inc., however, although formally the transferee of the patent prior to the purported sale to American, was apparently formed for several réasons, principally to exploit the patent, but utilized solely to serve as a conduit through which the interests of Arras and his backers could be transferred to American, and American's payments funneled back to Arras and his backers. The corporation was found to be unnecessary for the purpose and was dissolved, an attorney as trustee being thereafter utilized for the same limited purpose. This minimal use of the corporate form may well be ignored in arriving at the tax consequences of the inventor's disposition of his interests in the patent to American, and payment received by him from American. In any case, the interests were transferred to the trustee in trust for the taxpayers prior to the tax years in question.

By the original transaction of April 9, 1940, through Arras, Inc., and the later supplemental agreements between Arras, the trustee, and American, Arras succeeded in investing American with exclusive rights in the manufacture, sale, and use of the device covered by the patent, but retained (a) paper title, (b) a veto over sublicensing or transfer of rights under the license, (c) royalties and the right to check licensee's books, (d) an option to cancel the agreement if the patent were shelved, (e) a right to terminate for breach, (f) a duty to defend against infringement. By supplemental agreement December 9, 1944, the right to sublicense was granted American at a stated royalty to be divided evenly between licensors and American. In 1947 royalties were reduced in consideration of Arras' employment. In January 1952 they were further reduced. By supplemental agreement August 25, 1952, the right to sublicense was modified, reducing the royalty percentage on sales as original equipment, but giving Arras power to set sales price levels, subject to adjustment to meet competition. Do these retained relationships to the patent prevent this from being the sale of a capital asset? None of them individually would necessarily prevent the transaction from becoming a sale. See cases cited in Watkins v. United States, D.C.D. Conn., 149 F.Supp. 718, 724. The question is whether in the aggregate they added up to the reservation of substantial rights. Watkins v. United States, 2 Cir., 1958, 252 F.2d 722.

C. I. R. v. Hopkinson, 2 Cir., 1942, 126 F.2d 406, 410, held that where the patentee has surrendered all of his rights under the patent, payments based on use of the patent, commonly denoted as royalties, will be accorded capital gains treatment. The later case of Bloch v. United States, 2 Cir., 200 F.2d 63, cast some doubt on this rule. However, this was not a case of capital gains under Section 117 (1939 Code), but of withholding requirements of Section 211(a), 26 U.S.C. § 211(a). The Ninth Circuit in United States v. Carruthers, 1955, 219 F.2d 21 regarded the Bloch case as sui generis and Hopkinson in full vigor.

Transfer has been regarded as an assignment even though the patentee-transferor retains a reversionary interest on a condition subsequent such as shelving by the transferee. Pike v. United States, D.C.D.Conn.1951, 101 F.Supp. 100, 101; Watson v. United States, 10 Cir., 1955, 222 F.2d 689; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840, 841; First National Bank of Princeton v. United States, D.C.D.N.J.1955, 136 F. Supp. 818; Roe v. United States, D.C. S.D.Tex.1956, 138 F.Supp. 567; Kronner v. United States, 1953, 110 F.Supp. 730, 126 Ct.Cl. 156. The transferor may retain the right to approve subsequent as-

signments by the transferee, Watson v. United States, supra; First National Bank of Princeton v. United States, supra; retain the right to defend infringement suits; Watson v. United States, supra; First Nat. Bank of Princeton v. United States, supra; Roe v. United States, supra; and retain the title in the patent, Pike v. United States, supra, and still have the transfer regarded as an assignment for tax purposes.

■ In the case at bar, the complicated appearance given the transaction was occasioned by the sequence of circumstances rather than an effort to set up elaborate machinery to handle the deal with American. The assignment to Arras, Inc., was made before the formation of that corporation was complete, while financing and manufacture through that entity was in contemplation, the earlier offers of American having been unsatisfactory. However, when a satisfactory offer was received from American, that assignment to Arras, Inc., having already been made, the corporate formation was completed simultaneously with the execution of the contract with American, a step obviously desirable in view of the state of the record title. Any idea of exploitation through Arras, Inc., was however abandoned, and its meager equipment sold to American. In the light of the circumstances, neither the use of the corporate form, nor the precautionary provisions in case of failure of American to exploit, or breach by American, should alone lead us to call the transaction less than an assignment of substantially all taxpayer's rights in the patent.

There are, however, additional retentions here, particularly over transfer and sublicensing, which it is contended are substantial. While modifications of the sublicense terms were freely made at American's request, it is claimed to be significant that they were thought necessary, and that taxpayer, never relinquished the veto power which made them so, and that American in return for one of the sublicense modifications agreed to abide by taxpayer's decision as to prices to be charged. This is claimed to be inconsistent with a prior sale or assignment of all his rights under the patent.

■ It would have been as logical for courts to hold for tax purposes that the transfer, unconditional and irrevocable, of any substantial bundle of rights in the patents for the full term of the patents was a sale, as for them to hold that the transfer of substantially all rights was such, even if only for a limited territory, or an undivided portion of the whole. But the courts have been reluctant to go that far, although as indicated, they have rejected the Internal Revenue's claims that specific items such as the use of the term "license" or the receipt of periodic royalties would alone negate an assignment or sale, and the Tax Court has in the Parke, Davis case (Parke, Davis & Co. v. C. I. R., 31 B.T.A. 427) made the test "irrevocable divestment of certain capital investments". The Congress, although it has confirmed the rejection of the royalty item as a bar, has not been willing to rewrite the definition of sale or assignment, but has been content to leave that as the courts have interpreted it. We must therefore hold that the retention of substantial interests in the patent would preclude our defining a transaction as a sale. Such is not the case here, however, for although the sublicensing restrictions were important in the industry involved, and these modifications furnished consideration for the price-fixing power later conceded to the inventor, the inventor had given up all right to exploit the patent himself by his exclusive license to American and had so transferred what may be considered "substantially all" his rights in the patent. Rollman v. C. I. R., 4 Cir., 244 F.2d 634, 640. Even if the failure to allow sublicensing in the original agreement were considered retention of a substantial interest, it was largely whittled away by the modification of 1944, prior to the tax years in question.

The motion to dismiss is denied.

Form of Judgment in favor of plaintiffs may be submitted on notice.

## Finding of Facts.

1. Plaintiffs are citizens of the United States of America residing in New Britain in the District of Connecticut.

2. This action is a joinder of five independent claims against the United States of America and is brought under the provisions of Section 1346, Title 28, United States Code.

3. The plaintiffs' claims herein sued upon are brought for the recovery of internal revenue income taxes claimed to be erroneously and illegally collected from the plaintiffs as hereinafter more fully appears.

4. John J. Fitzpatrick was Collector of Internal Revenue for the collection district of Connecticut when the following alleged overpayments were made—namely, for the years 1949, 1950 and 1951 and is not in office at the date of the commencement of this action but the defendant James P. Graham was the Director of Internal Revenue for said District when alleged overpayments were made for 1952 and 1953.

5. Plaintiff Damiano Arras, an auto mechanic of some years' experience, developed an improved type of hose clamp.

6. Three of his friends, two auto mechanics and an oil salesman, assisted by advancing $990 in 1938.

7. Arras thereafter acquired a small press and went into production under a partnership agreement of April 1939 with his three backers, using space in the garage of one of the partners. The production, of the order of 2,000 clamps a week, was sold to auto parts concerns.

8. On inquiry of motor car manufacturers, it appeared that sales could be made in large quantity at a price of about 2¢. Cost in the limited quantity with the existing press was about 5¢.

9. A corporation, Arras, Inc., was formed with an idea of raising more money for large scale production and also to avoid liability for bills incurred by one of the partners.

10. The stock in the corporation was issued to the partners in the proportion of their partnership interest, Arras retaining the majority interest.

11. Some negotiations were had with American Hardware and others for licenses to manufacture. American proposed a contract which was not satisfactory to Arras, but after some three months the parties came to agreement and the contract of April 9, 1940 between Arras, Inc., to which an assignment of the patent had been made, Arras and American was entered into.

12. The machinery, a press and tools, was sold to American.

13. American invested over $200,000 in capital equipment for production of the clamp.

14. Arras, Inc., was thereafter inactive, receiving and distributing one royalty payment.

15. The corporation (Arras, Inc.) was dissolved in 1942 and a trust agreement entered into, the then shareholders becoming beneficiaries in the proportion of their shareholdings.

16. Arras was employed as a production worker at American on the same basis as other such workers at 85¢ an hour and later became a shop foreman. His employment by American was not originally related to the clamp patent license, although continuation of his employment was in 1947 expressed to be a consideration for modification of the royalties.

17. Various modifications of the patent agreement with American referred to herein, were drawn by American and were adopted at American's instance to meet conditions arising in the industry. The sublicensing modification came about since Chrysler insisted on a second supplier.

18. On March 9, 1939, plaintiff, Damiano Arras, applied for rights patent of the United States covering his invention called the Arras Hose Clamp, which invention had been perfected more than six months prior to that date. Said application was granted on November 14, 1939.

19. During the month of April 1939, the plaintiff, Damiano Arras, entered into the partnership agreement above referred to with the others who had assisted him in the financing, manufacturing, production and sale of said hose clamp in the following terms:

"That Whereas said Arras has filed an application for Letters Patent of the United States, Serial No. 260,833, March 9, 1939, entitled Hose Clamps, which application is now pending in the United States Patent Office;

"And Whereas said Arras, Barber, Meckensturm and Rogers are interested in the manufacture, sale and promotion of hose clamps based upon said patent application, and desire to become partners upon the terms and conditions hereinafter set forth.

"Now Therefore, said parties hereby agree—

"1. To become partners under the firm name of Arras Manufacturing Company which partnership shall continue indefinitely until terminated by mutual agreement.

"2. The partnership business and operations shall be carried on in New Britain, Connecticut, or at such other places which the partnership shall from time to time determine.

"3. The capital of said partnership shall be Nine Hundred and Ninety Dollars ($990.00), which is to be supplied as follows:

"said Barber agrees to put up the sum of Five Hundred and Fifty Dollars ($550.00), and

"said Meckensturm and said Rogers agree to put up the sums of Two Hundred and Twenty Dollars ($220.-00) each, said money to be deposited in a bank under the name of Arras Manufacturing Company.

"4. The capital of said partnership is to be invested in tools, patterns, raw materials, merchandise, etc., necessary for the purpose of manufacturing and selling said hose clamps on a mass production scale, and also to cover the expenses of obtaining a patent on said application.

"5. The profits derived from the business or from the sale of said application or patent obtained thereon will be divided as follows:

"55% to said Arras,

"24.75% to said Barber,

"10.125% to said Meckensturm, and

"10.125% to said Rogers.

"6. Said Arras agrees that he will not sell or license said application or patent to be granted thereon without the written consent of said Barber, Meckensturm and Rogers, and it is hereby agreed that if any dispute arises in regard to the partnership matters, it will be settled by arbitration.

"7. It is hereby agreed that no money can be expended upon the partnership business without the prior approval of all the four partners hereto."

20. On April 9, 1940 Damiano Arras as owner of said patent and Charles Barber, Edward Meckensturm, Silas J. Rogers, Eugene Muldoon, Manuel B. Clark and Vincent Williams, who had assisted financially in the production of said hose clamp, organized Arras, Incorporated, a Connecticut corporation, for the manufacture and sale of said hose clamp and are the beneficiaries of royalties distributed by a trustee in proportion to their respective stock holdings in said Arras, Incorporated.

21. On April 9, 1940 plaintiff Damiano Arras and Arras Incorporated entered into a license agreement with the American Hardware Corporation, a Connecticut corporation, said agreement providing for an exclusive right to manufacture, use and sell the patented hose clamps during the entire patent term. Sublicensing or transfer of patent rights was not permitted except to wholly owned subsidiaries except by consent. Title to the patents was expressed as retained by the licensors. Royalties of 10% of net

selling price were to be paid, and examination of American's books or a certified statement of a C.P.A. provided. Licensors were to have the right to cancel the agreement if American shelved the patent or on failure to pay the agreed royalties. Licensors agreed to defend and hold licensee harmless in suits for infringement of any patent on account of the manufacture, use or sale of the products covered by the agreement.

22. Said corporation (Arras, Inc.) was thereafter dissolved by the incorporators pursuant to an amendment to the charter terminating the existence of said corporation on September 15, 1942.

23. At all times plaintiff, Damiano Arras, had control of said corporation and upon the dissolution of said corporation the interests of the stockholders were retained by said Arras and others in said hose clamp in proportion of their respective corporate interests.

24. On August 24, 1942, said corporation assigned said patent to Manuel B. Clark of New Britain, Connecticut, in trust, for the collection and distribution of royalties.

25. Said assignments to Arras, Incorporated, and to Manuel B. Clark, Trustee, are evidenced by the following, which are copies of the only transfers registered in the United States Patent Office, Washington, D. C.:

"Assignment of Patent

"Whereas I, Damiano Arras, of the Town of New Britain, County of Hartford, State of Connecticut, did obtain letters patent of the United States for an improvement in Hose Clamp, which letters patent are numbered 2180271, and bear date the 14th day of November, 1939; and whereas Arras Incorporated of the Town of New Britain, County of Hartford, State of Conn., is desirous of acquiring the entire interest in the same:

"Now, therefore, in consideration of one or more dollars, the receipt of which is hereby acknowledged, I, Damiano Arras, by these presents do sell, assign and transfer unto Arras Incorporated, the whole right, title, and interest in and to the said letters patent therefor aforesaid; the same to be held and enjoyed by the said Arras Incorporated, for its own use and behoof, and for its assigns, to the full end of the term for which said letters patent were granted, as fully and entirely as the same would have been held by me had this assignment and sale not been made.

"Executed this 30th day of March, 1940.

"Damiano Arras (L.S.)"

"Assignment of Patent

"Whereas Arras Incorporated, a Connecticut Corporation, with a principal place of business in the Town of New Britain, County of Hartford and State of Connecticut, did obtain Assignment of Patent from Damiano Arras of the Town of New Britain, County of Hartford and State of Connecticut, which assignment was of a patent No. 2180271 and is recorded in the United States Patent Office, April 19, 1940, Liber 1183, Page 13.

"Now Therefore, for and in consideration of One or More Dollars and other valuable considerations, said Arras Incorporated by these presents does sell, assign and transfer unto Manuel B. Clark, as Trustee for Damiano Arras, Charles Barber, and Edward Meckensturm, all of the Town of New Britain, County of Hartford and State of Connecticut; Silas J. Rogers of Wilson, in the Town of Windsor, County of Hartford and State of Connecticut, Eugene Muldoon and Manuel B. Clark, both of the said Town of New Britain, and Vincent Williams, of the City of New York, Borough of Manhattan and State of New York, the whole right, title, and interest in and to the said letters patent therefor aforesaid; the same to be held and enjoyed by the said parties in trust, and for their own use and behoof, and for their assigns, to the full end

of the term for which said letters patent are granted, as fully and entirely as the same would have been held by Arras Incorporated had this assignment and sale not been made.

"Arras Incorporated
"Damiano Arras, Pres.    L.S."

26. Said agreement referred to in finding No. 21 between plaintiff, Damiano Arras, and Arras Incorporated and the American Hardware Corporation was amended by supplemental agreements between the parties dated December 9, 1944, November 14, 1947, January 22, 1952, August 25, 1952 and September 3, 1952. The agreement of December 9, 1944 provided that American might grant nonexclusive sublicenses at not less than 10% of the net gross sales price, half to be paid to the trustee under the trust agreement. The agreement of November 14, 1947 changed the royalty on sublicenses from 10% on all sales to 5% on all sales to auto manufacturers for use on original equipment and 10% on replacement or other uses. The agreement of January 22, 1952 changed the 5% figure on the sublicenses to 4%. The agreement of August 25, 1952 authorized American to grant either exclusive or nonexclusive sublicenses and changed the royalty back to 5% on sales for use on original equipment and 10% on other uses, American agreeing to abide by sales prices set by Arras and to require sublicensees to do likewise, subject to American's right to adjust and allow adjustment in sales prices to meet competition. The agreement of September 3, 1952 made the 5% and 10% rate applicable to American's direct sales.

27. At no time prior to the execution of the license agreement of April 9, 1940 did the plaintiff, Damiano Arras, have a principal or secondary occupation, trade or business as an inventor.

28. The plaintiffs received the following amounts under the license agreement:

(a) for the calendar year 1949 the sum of $4,351.44.

(b) for the calendar year 1950 the sum of $7,868.81.

(c) for the calendar year 1951 the sum of $9,107.31.

(d) for the calendar year 1952 the sum of $11,678.10.

(e) for the calendar year 1953 the sum of $24,488.91.

29. For the calendar years 1949, 1950, 1951 and 1952 plaintiffs reported said royalties as ordinary income on their federal income tax returns. For the calendar year 1953 plaintiffs reported said royalties on their federal income tax return as capital gain.

30. On March 14, 1953 plaintiffs filed claims for refund on Form 843 as follows:

(a) For refund of taxes paid for the year 1949 in the amount of $254.02.

(b) For refund of taxes paid for the year 1950 in the amount of $624.62.

(c) For refund of taxes paid for the year 1951 in the amount of $1,012.46.

(d) For refund of taxes paid for the year 1952 in the amount of $1,579.31.

31. A deficiency was assessed for the calendar year 1953 for additional taxes in the amount of $4,822.10 together with interest thereon in the amount of $289.-33, which amounts were paid by plaintiffs on March 23, 1955.

32. On April 13, 1955 plaintiffs filed a claim for refund of the sum of $5,221.43 of taxes paid for the calendar year 1953. Plaintiffs were notified by registered mail dated June 27, 1955 by the District Director of Internal Revenue that their claim for refund for the year 1953 was formally disallowed.

Conclusions of Law.

1. This court has full jurisdiction over the subject matter and the parties to this action.

2. Payments received by a taxpayer, holder of patent rights, for assignment or sale of those rights, are entitled to capital gains treatment if otherwise eligible, even though the payments are received periodically as royalties for

the manufacture, sale and use of the patented device.

3. Even though title to the patent be retained by taxpayer, the transaction may be considered a sale or assignment for income tax purposes if substantially all taxpayer's rights in the patent are transferred.

4. In the case at bar, substantially all taxpayer's rights in the patent were transferred prior to the tax years in question.

5. Payments received during the tax years in question by taxpayers from American under the licensing agreement of April 9, 1940 and the modifications thereof, were entitled to treatment as capital gains.

6. Plaintiffs are entitled to judgment for the taxes illegally assessed and paid, with interest and costs.