## LIQUID PAPER CORPORATION

v.

## The UNITED STATES.

### No. 292–79T.

United States Claims Court.

April 14, 1983.

Gene H. Emery, Dallas, Tex., for plaintiff. Donovan Campbell, Jr., and Michael V. Powell, Dallas, Tex., of counsel.

Robert N. Dorosin, Washington, D.C., for defendant. Asst. Atty. Gen. Glenn L. Archer, Jr., Theodore D. Peyser and Donald H. Olson, Washington, D.C., of counsel.

## OPINION

WHITE, Senior Judge.

The plaintiff, Liquid Paper Corporation, seeks a refund of federal income taxes and interest that were assessed and paid for the plaintiff's tax years which ended on April 30 of 1973, 1974, and 1975.

Formed in 1965, the plaintiff's principal business during the 1973–75 period was the manufacture and sale of correction fluid products. In its income tax returns for

those years, the plaintiff deducted royalty payments made pursuant to a 1970 assignment which transferred rights in a secret formula to the plaintiff for use in manufacturing and selling correction fluid products.

The Internal Revenue Service denied the deductions and assessed deficiencies against the plaintiff on May 13, 1977. The plaintiff subsequently paid the assessed taxes and interest, and it now seeks to have such amounts refunded.

### Background Information Concerning the Secret Formula and Liquid Paper Corporation

The secret formula that is the subject of this action was first developed in the 1950's by Mrs. Bette C. Graham. Mrs. Graham, then a secretary, recognized the need for a simple means of correcting typing errors made while using newly introduced carbon ribbons. She was also an amateur artist; and utilizing her knowledge of paints, Mrs. Graham developed a correction fluid which would cover and obscure a typing error and, after drying, permit the typist to type over the clean surface. Later, with assistance from a chemist, Mrs. Graham developed a fast-dry formula. Mrs. Graham kept her formula secret.

In 1957, Mrs. Graham established the Mistake Out Company, a sole proprietorship, for the purpose of manufacturing and selling correction fluid products. The correction fluid was originally sold under the name "Mistake Out," but in about 1959 the name was changed to "Liquid Paper." Mrs. Graham owned trademarks on both names.

Mrs. Graham incorporated the plaintiff on November 16, 1965, under the name of "Mistake Out Company." The name was changed to "Liquid Paper Corporation" on April 29, 1968.

Mrs. Graham, who received 550 shares of stock upon the plaintiff's incorporation, and her then husband, Robert Graham, who received 450 shares of stock, were the sole shareholders of the plaintiff from its formation until December 5, 1969. On December 5, 1969, Walter B. Bibby, who had become an officer of the plaintiff, acquired 10 per-

cent of the plaintiff's outstanding stock, receiving some shares from Mrs. Graham and some shares from Robert Graham. After this transaction, Mrs. Graham owned 49.5 percent of the plaintiff's outstanding stock, Robert Graham owned 40.5 percent of the stock, and Walter Bibby owned 10 percent of the stock. These three persons continued to be the sole stockholders of the plaintiff until 1975.

Mrs. Graham was the plaintiff's president from November 30, 1965, until April 30, 1968. In February 1968, Walter B. Bibby became general manager and executive vice president in charge of the plaintiff's business operations. Although Mrs. Graham retired in 1968 as president of the plaintiff because of her duties as a Christian Science practitioner, she became honorary chairman of the plaintiff's board of directors, and continued to exercise a dominating influence on the plaintiff's business policies. In 1976, Mrs. Graham retired as the plaintiff's honorary chairman of the board.

Mrs. Graham and Robert Graham were divorced in 1975.

Mrs. Graham died in 1980.

On December 1, 1965, shortly after the plaintiff was incorporated, Mrs. Graham assigned the registered trademark "Liquid Paper" to the plaintiff in consideration for 100 shares of the plaintiff's capital stock. Although the assignment expressly provided that it did not include the ownership of the secret formula for producing the correction fluid, the plaintiff was granted the right to use the formula without charge, subject to a right of revocation by Mrs. Graham on 10 days' notice. Mrs. Graham did not transfer the secret formula to the plaintiff upon its incorporation because she did not believe that the plaintiff was then financially capable of making royalty payments to her.

In an "Assignment and Agreement" dated January 30, 1970, Mrs. Graham declared that, "in consideration of royalties to be paid * * * [I] bargain, transfer, assign and set over unto Liquid Paper Corporation * * the secret formulas * * * used in the manu-

facture of the [correction fluid] products * * * together with the exclusive right to make, mix, blend, manufacture and sell the above mentioned products and any other products in which said formulas or modifications thereof are used." In consideration for the assignment of the secret formula, the plaintiff agreed to pay Mrs. Graham a royalty equal to 5 percent of the actual gross proceeds received from the sale of all products manufactured from the secret formula. The document also provided that the plaintiff had the right to license other persons to manufacture and sell the correction fluid products, and that any licensees should pay royalties directly to Mrs. Graham. Mrs. Graham expressly agreed not to divulge the secret formula to any other person.

The plaintiff's correction fluid experienced considerable success when it was introduced into the market. Until the 1970's, the plaintiff's market for correction fluid products was confined to the State of Texas. By 1971, however, the plaintiff's correction fluid products controlled approximately 30 percent of the market; by 1975, the plaintiff controlled between 50 and 55 percent of the market; and by 1979, when all of the plaintiff's stock was acquired by The Gillette Corporation (Gillette), the plaintiff's market share had increased to between 75 and 80 percent.

The plaintiff sold its correction fluid products in foreign as well as in domestic markets. In addition to its principal plant in Markville, Texas, the plaintiff established manufacturing facilities in Canada (1970), Belgium (1974–1975), and Australia (1978). As a result, during the 1970's the plaintiff was selling its correction fluid products in a virtually world-wide market.

Although the plaintiff experienced much success, it had an increasing number of competitors in the market for correction fluid products. In 1968, there were three companies other than the plaintiff manufacturing correction fluid; and, by 1979, the plaintiff had approximately 30 competitors. The plaintiff owed its success and large market share in part to its skillful marketing strategies and to the fact that, until

about 1975, its correction fluid products, based on the unique secret process, were superior to other correction fluid products on the market.

At all times during plaintiff's existence, approximately 90 percent of its sales were in the office typewriter market. The plaintiff sold its products to wholesalers and to office supply dealers, who then sold the products to offices and businesses. The remaining 10 percent of the plaintiff's sales were in the so-called "mass market," which included principally the home-use portable typewriter and handwriting markets. The plaintiff distributed its products to the mass market mainly through drug store and variety store chains.

At the time when it was sold to Gillette in 1979, the plaintiff's correction fluid products consisted of about 10 basic items. There were several standard colors, a "Special Match," which was custom-made to match a buyer's letterhead, and a "Just-for-Copies," intended for use on photocopies. The plaintiff's basic white correction fluid, No. 564, accounted for the largest share of plaintiff's sales. The basic white correction fluid was also sold in single-bottle packages, No. 564C, to the mass market.

In January 1973, the International Business Machines Corporation (IBM) introduced its Selectric Electric typewriter, with the new correctable ribbon. The correctable ribbon permitted a typist to lift an error off the page, simply by striking a special backspacing function and the appropriate key. The plaintiff recognized that the correctable ribbon posed a serious competitive threat to its sales of correction fluid products. In response to the threat, the plaintiff decided to enter the correctable ribbon market. "Project Spindle," as it was called, was secretly begun in late 1973 and early 1974, and resulted in the plaintiff's acquisition of a carbon and ribbon manufacturing company, the Peerless Carbon and Ribbon Company. In 1976, the plaintiff built its own factory in Greenville, Texas, for manufacturing correctable ribbons.

In 1979, the plaintiff decided to abandon the use of the secret formula. There were several reasons for the decision. During the late 1970's, the relations between the plaintiff and Mrs. Graham had become less than harmonious. In 1978, Mrs. Graham filed a lawsuit against the plaintiff over a dispute about royalty payments to Mrs. Graham from the plaintiff's Canadian licensee. The plaintiff also filed a suit in 1978 to enjoin Mrs. Graham from attempting to register the trademark "Liquid Paper" after it had been sold to the plaintiff. The plaintiff feared that, as a result of these disputes, Mrs. Graham might suddenly decide to withdraw the company's right to use the secret formula. In addition, the plaintiff concluded that it was no longer realistic or economical to continue paying a 5 percent royalty on a formula that, after about 1975, was no longer unique or superior to other formulas for correction fluid products then on the market.

Because of the factors mentioned in the preceding paragraph, the plaintiff developed its own formula for use in manufacturing correction fluid products, and notified Mrs. Graham by letter that effective January 31, 1979, the plaintiff would no longer use her secret formula or pay her royalties from the sale of the plaintiff's correction fluid products.

In June or July of 1979, the plaintiff's board of directors decided that it would be in the best interest of the corporation to sell all of the plaintiff's stock to Gillette; and Gillette purchased all of the plaintiff's stock pursuant to an agreement dated September 20, 1979.

In order to accomplish the sale to Gillette, it was necessary to obtain Mrs. Graham's consent, as she was still a large stockholder of the plaintiff. Gillette entered into an agreement with Mrs. Graham, whereby Gillette agreed to pay a royalty to Mrs. Graham (or her estate after her death) based on percentages of its gross proceeds from all correction fluid products, regardless of whether those products were manufactured through the use of the secret formula. This obligation to pay royalty to Mrs. Graham (or her estate) will expire in 1996.

## The Income Tax Deductions

In the plaintiff's income tax return for 1973, it deducted the royalty payments which it made to Mrs. Graham, in the amount of $270,251, as an expense item entitled "product royalties" under "other deductions."

In the plaintiff's return for 1974, the royalty payments in the amount of $361,295 were deducted as a "cost of goods sold."

In the plaintiff's return for 1975, the royalty payments in the amount of $472,406 were also deducted as a "cost of goods sold."

These deductions were disallowed by the Internal Revenue Service (IRS), which assessed additional income taxes in the amount of $409,870, plus interest, against the plaintiff. The plaintiff paid the assessments, and now seeks to recover the amounts so paid.

The plaintiff argues that the royalty payments made to Mrs. Graham pursuant to the 1970 assignment of the secret formula were deductible either under section 162 of the Internal Revenue Code of 1954 (the 1954 Code) as ordinary and necessary business expenses, or under section 167 of the 1954 Code as a reasonable allowance for depreciation or amortization of the secret formula. The plaintiff, relying on section 446 of the 1954 Code, also contends that the deductions were proper because the plaintiff deducted the royalty payments on its books of account and records, and its internal accounting methods clearly reflected its income.

The defendant, on the other hand, argues that the plaintiff was not entitled to deduct the royalty payments under any of the theories advanced by the plaintiff.

## Related Litigation

The assignment of the secret formula to Liquid Paper Corporation in 1970 has been the subject of previous tax litigation.

Mrs. Graham, after paying a tax deficiency assessed against her by the IRS for the

year 1972, filed a suit on July 8, 1977, in the United States District Court for the Northern District of Texas for a refund of taxes for the year 1972. Mrs. Graham argued that she was entitled to long-term capital gains treatment for royalty payments received by her pursuant to the assignment of the secret formula to Liquid Paper Corporation. The IRS, on the other hand, contended that the payments should be treated as ordinary income because (1) the 1970 assignment constituted a license rather than a sale, and (2) even if the assignment was a sale, section 1239 of the 1954 Code precluded capital gains treatment because the secret formula was property of a character which was subject to the allowance for depreciation provided for in section 167 of the 1954 Code. The district court concluded that the transfer was a sale because Mrs. Graham had surrendered all substantial rights of value in the secret formula, including the right to divulge the secret to others. The court also held that section 1239 of the 1954 Code was inapplicable because the court determined that the secret formula was not subject to depreciation. Consequently, the district court held that the royalty payments should be treated as long-term capital gains. *Graham v. United States,* 79–1 U.S. Tax Cas. (CCH) 9274 (N.D.Tex.1979).

On June 29, 1977, before the commencement of Mrs. Graham's suit, Robert Graham filed a suit in the United States Tax Court for refund of income taxes for the years 1972, 1973, 1974, and 1975. His refund claims for 1972, 1973, and 1974 involved taxes on royalty payments from Liquid Paper Corporation, as he had signed joint income tax returns with Mrs. Graham for those years. After the district court rendered its decision in Mrs. Graham's case, Robert Graham moved for summary judgment in the Tax Court on the ground that the Government, as a result of the district court's determinations in Mrs. Graham's case, was collaterally estopped from arguing that payments received by him pursuant to the transfer of the secret formula should be treated as ordinary income. The Tax Court agreed that collateral estoppel

applied, and granted summary judgment. *Graham v. Commissioner,* 76 T.C. 853, 861 (1981).

In a third proceeding, the executor of Mrs. Graham's estate filed a suit in this court's predecessor, the U.S. Court of Claims, for a tax refund for the years 1973 and 1974. On cross-motions for summary judgment, the court held, first, that a protest letter filed by Mrs. Graham and Robert Graham, when considered with an interpleader petition filed by the Government in Mrs. Graham's district court case, sufficed as a timely filing of an informal claim for a refund. The court then held that since the district court had determined the proper tax treatment of the royalty payments to Mrs. Graham, the Government was collaterally estopped from relitigating the same issue for the later tax years. *Furst v. United States,* 230 Ct.Cl. ——, ——, 678 F.2d 147, 153–56 (1982).

### The 1970 Assignment Agreement: Sale vs. License

The plaintiff's first legal theory is that the 1970 assignment granted the plaintiff merely a license to manufacture and sell products derived from the secret formula, and, therefore, that the royalty payments made to Mrs. Graham were deductible as ordinary and necessary business expenses. The defendant argues, on the other hand, that the 1970 assignment resulted in a sale of the formula to the plaintiff, and, therefore that the royalty payments were capital expenditures and not deductible under section 162(a) of the 1954 Code.

The tax law on the transfer of patent rights is applicable, by analogy, to the tax treatment of transfers of secret formulas and trade secrets. *E.g., Hooker Chemicals & Plastics Corp. v. United States,* 219 Ct.Cl. 161, 175–76, 591 F.2d 652, 659 (1979); *E.I. DuPont de Nemours & Co. v. United States,* 153 Ct.Cl. 274, 288–89, 288 F.2d 904, 912 (1961); *Pickren v. United States,* 378 F.2d 595, 599 (5th Cir.1967). The transfer of a secret formula constitutes a sale if the transferor surrenders all substantial rights

of value in the formula. *E.g., Hooker Chemicals & Plastics Corp. v. United States, supra,* 219 Ct.Cl. at 172–73, 591 F.2d at 658; *Bell Intercontinental Corp. v. United States,* 180 Ct.Cl. 1071, 1077, 381 F.2d 1004, 1010–11 (1967); *E.I. DuPont de Nemours & Co. v. United States, supra,* 153 Ct.Cl. at 288–89, 288 F.2d at 912. Merely a license results, however, if the transferor retains any rights of substantial value.

 In interpreting an agreement, a court must ascertain the mutual intention of the parties and then give effect to that intention, so long as it is consistent with legal principles. *Pickren v. United States, supra,* 378 F.2d at 599. The language of the agreement, together with the surrounding circumstances, must be considered. *E.g., Hooker Chemicals & Plastics Corp. v. United States, supra,* 219 Ct.Cl. at 173, 591 F.2d at 658; *Kronner v. United States,* 126 Ct.Cl. 156, 163, 110 F.Supp. 730, 734 (1953). The nomenclature and labels employed by the parties, however, are not decisive; the substance of the transaction governs whether it is a sale or a license. *E.g., Hooker Chemicals & Plastics Corp. v. United States, supra,* 219 Ct.Cl. at 173, 591 F.2d at 658; *Bell Intercontinental Corp. v. United States, supra,* 180 Ct.Cl. at 1077, 381 F.2d at 1011; *Kronner v. United States, supra,* 126 Ct.Cl. at 163, 110 F.Supp. at 734; *Watson v. United States,* 222 F.2d 689, 691 (10th Cir. 1955).

 The plaintiff argues that the language of the 1970 assignment unambiguously established that it constituted a license rather than a sale. The document provided in pertinent part as follows:

* * * BETTE C. GRAHAM * * * for and in consideration of the royalties to be paid * * * does hereby bargain, transfer, assign and set over unto Liquid Paper Corporation * * * the secret formulas * * used in the manufacture of the [correction fluid] products * * * together with the exclusive right to make, mix, blend, manufacture and sell the above mentioned products and any other products in which such formulas or modifications are used. * * *

Assignee expressly agrees to pay Assignor a royalty equal to 5 percent of the actual gross proceeds received from the sale of all Basic Products * * *.

\*　　\*　　\*　　\*　　\*　　\*

Assignee shall have the right to license the manufacture and sale of the Basic Products by others; * * * the licensee * * * to make payments directly to Assignor of the royalties due and payable on the sales made by such licensee. * * *

The plaintiff calls attention to the fact that the language "bargain, transfer, assign and set over" said nothing about a sale. However, no particular word, such as "sell," is required to make a transfer a sale, as the substance of the transaction is the governing factor.

The plaintiff also argues that the assignment constituted a license because it did not expressly grant the plaintiff the right to "use" the secret formula. The plaintiff relies principally on *Waterman v. Mackenzie,* 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891). In *Waterman,* the issue was whether an assignee of patent rights to manufacture and sell, but not to use, the patented article could sue a third party for infringement of the patent. The Court stated in part as follows (*id.* at 256, 11 S.Ct. at 335–336):

* * * [T]he grant of an exclusive right under the patent within a certain district, which does not include the right to make, and the right to use, and the right to sell, is not a grant of a title in the whole patent right within the district, and is, therefore only a license. * * * So is an instrument granting "the sole right and privilege of manufacturing and selling" patented articles, and not expressly authorizing their use * * *.

 In tax cases, however, most courts have concluded that *Waterman* is not strictly applicable in determining whether a transfer is a sale or a license. The decisive test remains whether the grantor retains any substantial rights of value in the transferred property. The retention of a right that has no practical or commercial value

does not preclude a transfer from constituting a sale. *E.g., Hooker Chemicals & Plastics Corp. v. United States, supra,* 219 Ct.Cl. at 173, 591 F.2d at 658; *Bell Intercontinental Corp. v. United States, supra,* 180 Ct.Cl. at 1090–91, 381 F.2d at 1018–19. Thus, courts have held in some cases that the grantor's retention of a right to use a patented device was not a substantial right. *E.g., Bell Intercontinental Corp. v. United States, supra,* 180 Ct.Cl. at 1090–91, 381 F.2d at 1018–19; *Lockhart v. Commissioner,* 258 F.2d 343, 349 (3rd Cir.1958); *Rollman v. Commissioner,* 244 F.2d 634, 639 (4th Cir. 1957); *C.A. Norgren Co. v. United States,* 268 F.Supp. 816, 820–21 (D.Colo.1967); *Flanders v. United States,* 172 F.Supp. 935, 949–50 (N.D.Cal.1959).

The 1970 assignment effected a transfer to the plaintiff of all of Mrs. Graham's substantial rights in the secret formula. The formula was valuable for its use in manufacturing and selling correction fluid products. The right merely to use the formula, but not to manufacture or sell products derived from it, had no practical or commercial value. Moreover, the plaintiff's exclusive right to "make, mix, blend, manufacture and sell" products derived from the formula impliedly included the right to use the formula. The failure of the parties to employ the word "use" in the granting clause did not alter the substance of the transaction.

This court's predecessor, the Court of Claims, stated that the most valuable right in a trade secret or secret formula is the right to disclose the secret to others. *Hooker Chemicals & Plastics Corp. v. United States, supra,* 219 Ct.Cl. at 176, 591 F.2d at 660; *E.I. DuPont de Nemours v. United States, supra,* 153 Ct.Cl. at 287, 288 F.2d at 911–12. Consequently, further support for the conclusion that Mrs. Graham surrendered all substantial rights in the formula is found in the fact that she expressly agreed in the assignment not to divulge the secret formula to any party other than plaintiff, whereas the assignment granted to the plaintiff the right to authorize other persons to manufacture and sell correction fluid products based on the secret formula,

thus impliedly granting the plaintiff the right to disclose the secret formula to third-party licensees.

It is true that the provision in the assignment granting the plaintiff the right to license other persons to manufacture and sell correction fluid products required that such persons make royalty payments directly to Mrs. Graham. This requirement, however, was not inconsistent with a sale. *See Rollman v. Commissioner, supra,* 244 F.2d at 639–40 (requirement that assignee of patent rights obtain consent of assignor before granting sublicenses under the patents not inconsistent with a sale). Requiring any licensee of the plaintiff to make royalty payments to Mrs. Graham was merely a reasonable means of protecting Mrs. Graham's rights under the assignment.

■ Moreover, it is well settled that an assignment requiring payments based upon a percentage of sales, as in this case, is not inconsistent with a sale. *E.g., Bell Intercontinental Corp. v. United States, supra,* 180 Ct.Cl. at 1077–78, 381 F.2d at 1011; *Lockhart v. Commissioner, supra,* 258 F.2d at 349–50; *Reid v. Commissioner,* 26 T.C. 622, 632 (1956).

The plaintiff argues that, besides the language in the agreement, other evidence in the record establishes that the parties' mutual intention was to create a license. Although the plaintiff's position has some support in the record, it is not established by a preponderance of the evidence.

Walter Bibby, the plaintiff's president during the relevant years and signatory for plaintiff on the 1970 agreement, testified that the plaintiff intended, at and before the time of signing, for the agreement to create a license. Frank Bell, the plaintiff's chief financial officer, also testified that the plaintiff considered the agreement to be a license. Both Messrs. Bibby and Bell testified that the plaintiff intended that it should be able to take an income tax deduction on payments made for the use of the secret formula; and both also testified that the plaintiff did not believe it could sell the formula. Of course, the plaintiff's inten-

tion would not be determinative on the question of whether the 1970 assignment was a license or a sale.

As evidence of a mutual intention, the plaintiff points to Mrs. Graham's testimony at her district court trial, in which she stated that she agreed with the way the plaintiff was deducting the royalty payments. However, Mrs. Graham also testified at her district court trial that she had agreed to having her income tax returns prepared to reflect long-term capital gains treatment for the receipt of the royalty payments. Furthermore, Mr. Bibby testified that he knew Mrs. Graham hoped to obtain capital-gains treatment. Hence, the testimony of the parties is inconclusive about their mutual intention and certainly does not establish by a preponderance of the evidence that their mutual intention was to create a license agreement.

Also unpersuasive is the plaintiff's contention that the parties' practical construction of the agreement demonstrates that it was a license.

It is true, as the plaintiff says, that it consistently deducted its royalty payments as an expense on its federal income tax returns and never listed the formula as an asset on its balance sheet. On the other hand, it is equally significant that Mrs. Graham consistently treated her receipt of the royalty payments as long-term capital gains.

The plaintiff is also factually accurate in citing an episode in which Mrs. Graham displayed a threatening attitude toward, and filed a lawsuit against, the plaintiff in connection with a dispute over the payment of royalties to Mrs. Graham by a Canadian licensee of the plaintiff. However, Mrs. Graham's attitude in that episode does not indicate that she considered the assignment to be a license. A lawsuit to compel payment of royalties allegedly due under an assignment is not inconsistent with the concept of the assignment as a sale. *Cf. Hooker Chemicals & Plastics Corp. v. United States, supra,* 219 Ct.Cl. at 173, 591 F.2d at 658 (right to terminate agreement upon the occurrence of stated events or conditions

does not preclude a transaction from being a sale; such a right is uniformly treated as a condition subsequent, analogous to provisions in realty conveyances calling for reversion of title previously vested); *Bell Intercontinental Corp. v. United States, supra,* 180 Ct.Cl. at 1078, 381 F.2d at 1011 (same).

In addition, the plaintiff refers to its failure to license the right to use the formula to parties other than the plaintiff's subsidiaries. This failure, however, cannot be regarded as indicating that the assignment was a license, for the plaintiff plainly had the right under the assignment to license any third party if it wished to do so.

Finally, the court does not accept the testimony of the plaintiff's accounting expert as a basis for concluding that the assignment constituted a license. The accounting expert testified that general accounting principles require that the agreement be regarded as a license. However, as stated earlier in the opinion, the applicable test for determining whether a transaction is a sale or a license is whether the transferor has retained any substantial rights of value in the transferred property. In this case, Mrs. Graham transferred to the plaintiff all of her substantial rights in the secret formula, and did not retain any such rights.

■ As it is found and determined that the assignment constituted a sale rather than a license, the plaintiff could not properly deduct the royalty payments as ordinary and necessary business expenses under section 162 of the 1954 Code.

### Depreciation or Amortization of the Secret Formula

The plaintiff's next contention is that if the 1970 assignment agreement constituted a sale of the secret formula, then the plaintiff was entitled to depreciate or amortize the cost of the transfer.

Section 167(a) of the 1954 Code provides that "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1)

of property used in the trade or business * * *." Treasury Regulation § 1.167(a)–3 establishes the circumstances under which intangible property, such as the plaintiff's secret formula, is subject to depreciation. This regulation provides in pertinent part as follows:

*Intangibles*

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * *

Treasury Regulation § 1.167(a)–1(b) provides that "[f]or the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business * * *." The period of useful life should be determined by reference to experience with similar property, taking into account present conditions and probable future developments.

The regulations provide that some of the factors that should be considered in determining the period of useful life are: (1) wear and tear and decay or decline from natural causes; (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business; and (3) the climatic and other local conditions peculiar to the taxpayer's trade or business; and (4) the taxpayer's policy as to repairs, renewals, and replacements.

As the applicable regulations provide, an intangible asset may be depreciated if it has a limited useful life that can be ascertained with "reasonable accuracy."

The law does not require "[e]xtreme exactitude in ascertaining the duration of an asset." *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1253–54 (5th Cir.1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974); *see also, e.g., Richard S. Miller & Sons v. United States,* 210 Ct.Cl. 431, 445, 537 F.2d 446, 455 (1976); *Virginia Electric & Power Co. v. United States,* 188 Ct.Cl. 120, 127, 411 F.2d 1314, 1317 (1969); *Pennsylvania Power & Light Co. v. United States,* 188 Ct.Cl. 76, 84, 411 F.2d 1300, 1305 (1969). The Supreme Court has stated that a "rough estimate" or "reasonable approximation" is sufficient. *Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 655, 51 S.Ct. 262, 265, 75 L.Ed. 594 (1931); *United States v. Ludey,* 274 U.S. 295, 302, 47 S.Ct. 608, 610, 71 L.Ed. 1054 (1927). A taxpayer is not required to establish the useful life of a product to a "reasonable certainty." *Burnet v. Niagara Falls Brewing Co., supra,* 282 U.S. at 654, 51 S.Ct. at 264–265.

The determination whether an asset is depreciable depends on the circumstances existing as of the end of the tax year for which the depreciation deduction is claimed. *The Chronicle Publishing Co. v. Commissioner,* 67 T.C. 964, 980 (1977); *Westinghouse Broadcasting Co. v. Commissioner,* 36 T.C. 912, 921 (1961), *aff'd,* 309 F.2d 279 (3rd Cir.1962), *cert. denied,* 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963).

The plaintiff contends that its secret formula had a limited useful life that could be estimated with reasonable accuracy. Moreover, the plaintiff argues that a reasonably accurate estimate was possible at the end of the tax years in question—1973, 1974, and 1975. The defendant argues, however, that the secret formula did not have a reasonably ascertainable useful life and, consequently, that the formula was not subject to depreciation.

Both sides presented expert testimony and other evidence at trial on the subject of the formula's useful life. For convenience, the most important aspects of the testimony presented at the trial on the useful life

issue will be summarized before the issue is discussed by the court.

*Esmond C. Lyons, Jr.*

Esmond C. Lyons, Jr., who is director of the Computer Industries Department at SRI International (SRI), Menlo Park, California, testified as an expert witness for the plaintiff. SRI was formerly known as Stanford Research Institute and was affiliated with Stanford University. SRI is now an independent organization that provides research and consulting services to business and government clients throughout the world.

Mr. Lyons holds a B.S. degree, with a major in physics, from the University of Maryland. He has published articles pertaining to image processing.

Before joining the SRI staff in 1979, Mr. Lyons had approximately 20 years of experience in the marketing of computers and microelectronics. In 1974 and 1975, he was national sales manager for a company engaged in the development of an inexpensive typewriter mechanism for the electronic typewriter market.

At SRI, Mr. Lyons has been engaged in a study for the National Office Products Association on the impact of new technology in the office products industry. Mr. Lyons is an expert in the areas of marketing management, strategic planning, product and market analysis and evaluation, new product diffusion and introduction techniques, and international sales and marketing.

Mr. Lyons expressed the following views:

(1) There will be a limited product life for the office product known as correction fluid, because advances in typewriter technology will virtually eliminate the use of correction fluid.

(2) It is possible to make a reasonably accurate determination of when the product life for correction fluid will end, and this determination is that the product life will end in 1997, at the latest. By the end of 1990, 90 percent of the peak-year consumption will have been eliminated. The manufacture and sale of correction fluid products will not be viable after 1995.

(3) It was possible by April 30, 1973, and at all times thereafter; to determine that correction fluid had a limited product life. It would have been possible by April 30, 1973, and at all times thereafter, to make a reasonably accurate determination of when that useful life would end.

Mr. Lyons based his opinion that there is a limited product life for the correction fluid product on his knowledge of technological improvements in the typewriter industry and the impact of those improvements on the market for correction fluid. With respect to such technological improvements, his testimony was to the following effect:

(1) There are three types of typewriter technologies in the marketplace: the electric typewriter, the electronic typewriter, and the word processing machine.

(2) The electric typewriter is the familiar device that makes impressions on paper by means of a ball or a bar striking paper. Electric typewriters have no memory capability or electronic circuitry. There was a great advance in electric typewriter technology in 1973, when IBM introduced its self-correcting typewriter. There are self-correcting ribbons that give virtually all electric typewriters the self-correcting ability.

(3) The next wave of innovation in the typewriter market was the electronic typewriter, which has come computer circuitry and therefore memory capability. When a typist makes a mistake on an electronic typewriter, the machine automatically erases the error and types it correctly. It is SRI's forecast that electronic typewriters will largely displace electric typewriters during the decade of the 1980's. Electronic typewriters will replace electric typewriters, not only in the office typewriter market but also in the home portable typewriter market.

(4) The most advanced level of technology is the word processor. Word processing machines will become increasingly important in the office typewriter market and they will be capable of producing large volumes of typing.

(5) The only kind of typewriter technology that supports a need for correction fluid is the electric typewriter, the oldest technology in the market. A typist with an old electric typewriter, with no self-correcting capability, uses correction fluid to correct mistakes, either with the page in or with the page out of the typewriter. The self-correcting feature, introduced in 1973, eliminated the use of correcting fluid for mistakes while the page is still in the typewriter. Electronic typewriters and word processing machines eliminate the use of correction fluid altogether, as mistakes are corrected by using the machine's memory device.

Mr. Lyons' opinion that the product life of correction fluid will end in 1997, at the latest, was based upon the following analysis: the average life of an office typewriter is from 6 to 8 years; virtually all typewriters in use in 1973 will be eliminated from the market by the expiration of two average lives, or by 1989; one additional average life span of from 6 to 8 years may be added for a lagging foreign market and such markets as the home portable market; thus, by 1997, at the latest, the typewriter population will not contain sufficient numbers of typewriters with which correction fluid is used to permit that product to remain viable. In 1973, Mr. Lyons would have forecast the year 2000 as the year in which the product life of correction fluid would end; but because the rate at which the marketplace has accepted advanced technology typewriters has actually been faster than Mr. Lyons would have anticipated in 1973, he would now forecast the useful life of the product to end in 1995.

Mr. Lyons' opinion that it would have been possible to form a reasonably accurate opinion about the useful life of correction fluid by April 30, 1973, was based on the following analysis: IBM's self-correcting typewriter was announced in 1973; a survey could have been done at that time to determine how much a secretary's use of correction fluid decreased when she obtained a self-correcting typewriter; it could have been predicted in 1973 with a high degree of accuracy what the rate of acceptance of the self-correcting typewriter in the market would be; although electronic typewriters were not being sold by April 30, 1973, the basic technology for that typewriter, a device called a "daisy wheel," was known by that time, and plans were being made to produce electronic typewriters.

*Thomas R. Hofstedt*

Thomas R. Hofstedt, who is Professor of Accounting and Chairman of the Accounting Subject Area at the Edwin L. Cox School of Business Administration, Southern Methodist University, testified as an expert witness for the plaintiff. Professor Hofstedt holds a Ph.D degree in business administration from Stanford University. He has taught all university levels of financial accounting courses and has published approximately 20 scholarly articles in the fields of accounting and business. Professor Hofstedt has also served as a consultant to major corporations and the United States Department of Health, Education, and Welfare (now the Department of Health and Human Services).

Professor Hofstedt's testimony related principally to accounting principles and their application. However, on the subject of useful life, he said that the life of a secret formula, if it is an asset, can be reasonably estimated and is likely to be relatively short. Simple intuition and observation suggest that technological and competitive changes will erode the value of the formula for correction fluid. This is shown by the circumstance that the profitability of the plaintiff, measured by return on assets, declined substantially from 1970 through 1979. Any corporation would abandon the correction fluid business by the time when the market for that product has been reduced to 10 percent of its peak-year volume.

*Walter B. Bibby*

The plaintiff's former president, Walter B. Bibby, also testified on the subject of the useful life of correction fluid products. His testimony was to the following effect:

The plaintiff believed the introduction in 1973 of the IBM Correcting Selectric would

have a profound impact on the plaintiff's correction fluid market. Over 90 percent of the plaintiff's total volume was in the office supply typewriter market, a percentage which remained constant throughout the plaintiff's history. The plaintiff knew in 1975 that 55 percent of all new typewriters being sold were Correcting Selectrics and that, as a result, the plaintiff's market was being seriously eroded. The plaintiff was aware that a typist's consumption of correction fluid declined by 55 to 80 percent when using a self-correcting typewriter. Moreover, the plaintiff also recognized by 1973 that word processors on the market posed an additional threat to the correction fluid market.

The plaintiff decided to respond to the competitive threat by expanding its markets for correction fluid products, and by initiating "Project Spindle" in 1974, a plan for plaintiff's entry into the correctable ribbon market. The plaintiff acquired a carbon and ribbon manufacturing firm, the Peerless Carbon and Ribbon Company, and built a factory in Greenville, Texas, for the manufacture of correctable ribbons. The plaintiff publicly announced its entry into the correctable ribbon business in 1977.

*Barnett A. Greenberg*

Barnett A. Greenburg, Professor of Marketing in the College of Business Administration, North Texas State University, and Director, Office of Research and Publications, NTSU Center for Marketing and Design, testified as an expert witness for the defendant. Professor Greenberg holds the degrees of Bachelor of Business Administration and Master of Business Administration from the University of Texas at Austin, and the degree of Doctor of Business Administration from the University of Colorado. Before joining the faculty of North Texas State University, he taught as an assistant in the School of Business Administration at the University of Texas at Austin, as an associate in the School of Business Administration at the University of Colorado, and as an Assistant Professor and Associate Professor of Marketing at Georgia State University. He is the co-author of a book in the field of marketing research and the author or co-author of numerous articles that appeared in professional publications relating to the field of marketing, and he has presented many papers at meetings and conferences dealing with aspects of marketing.

Professor Greenberg's testimony at the trial dealt with the question of whether the plaintiff could predict, with reasonable accuracy, the life expectancy of the secret formula. His testimony is summarized in the following numbered paragraphs:

(1) It would not have been possible for the plaintiff to predict with reasonable accuracy a terminal point in time which would establish the "life expectancy" of the secret formula.

(2) The secret formula is not a product *per se.* Rather, it is a formula from which a number of products may be derived.

(3) Further complicating the issue of product definition is the question of diverse markets and market structures into which the same physical product form may enter. A bottle of basic white correction fluid sold to the office supply market is not the same product as a bottle sold to the home use market. These markets have different channels of distribution structures, pricing structures, order quantities, repurchase rates, channels of communication, and other market related parameters. Thus, the same or similar product form must be treated as a unique product offering for each end-user defined market. Of even greater significance in this case are the varying states of development in technologies which affect demand for LPC products. Generally known as "technology transfer," this parameter of market structure results in successive growth opportunities as various national economies experience development in generations of word processing technology.

(4) "Life expectancy" is defined in terms of the ability of the formula to produce economically viable products for the company. A widely referenced theoretical framework for considering the life of a product is known as the "product life cycle" (PLC). Serious problems often prevent direct appli-

cation of the PLC, and several of these problems are present in the case of the plaintiff. It is difficult to know where a product is on a hypothetical life cycle without the advantage of hindsight. Many products do not go through all of the stages or do not go through them in sequence. In fact, it is quite common for products to enter the same stage several times.

(5) There was no indication of pending market saturation or other threatening environmental condition as of 1970 which would have enabled the plaintiff to project with reasonable accuracy even the end of the growth stage for the basic white correction fluid in the domestic office supply market.

(6) The only forecasting tools available for projecting the useful life of correction fluid products as of 1970 all involve subjective judgment and therefore fail to meet the definition of reasonable accuracy. Such techniques can be used to develop long-term scenarios and "best guess" forecasts, but they lack precision.

(7) At the end of 1973, the PLC for each of the four primary product form groups of the plaintiff remained in the growth stage. The plaintiff was in a position to seek continued growth for its products by implementing one or both of two strategic alternatives: entry into foreign markets would be an effective long-term hedge against deterioration of the office supply market for correction fluid; and aggressive development of additional products and home use distribution would make the domestic performance of products less dependent upon the office supply market. Considering continued sales growth and ample opportunity, projections of useful life remain subjective and imprecise.

(8) An overall analysis of the 1970–79 activities and performances of the plaintiff, and of environmental factors and market intelligence, led to the conclusion that the secret formula did not at any time have a limited useful life. Even if some of the product forms had limited useful lives in selected markets, it would not have been possible to predict with reasonable accuracy

the length of that useful life even as recently as 1979.

■ The Government correctly contends that trade secrets and secret processes are generally not depreciable because, unlike patents and copyrights, which are intangible properties that have fixed useful lives, trade secrets and secret processes usually have no ascertainable useful life. *E.g., Kaltenbach v. United States,* 66 Ct.Cl. 581, 587 (1929); *Yates Industries, Inc. v. Commissioner,* 58 T.C. 961, 974 (1972) ("A trade secret generally has no ascertainable use life unless such a useful life may be fixed relative to some particular circumstance"), *aff'd. mem.,* 480 F.2d 920 (3rd Cir.1973). The useful life of a trade secret ends only when the secret is disclosed or when obsolescence occurs.

■ Determining whether an asset has an ascertainable useful life is a factual inquiry. *Burlington Northern Inc. v. United States,* 230 Ct.Cl. ——, ——, 676 F.2d 566, 574 (1982); *Zimmerman v. Commissioner,* 67 T.C. 94, 106 (1976); *Radio Station WBIR, Inc. v. Commissioner,* 31 T.C. 803, 817 (1959). In the present case, although there is evidence on both sides, the preponderance of the evidence supports the plaintiff's contention that its secret formula had a limited useful life, the length of which could have been determined with reasonable accuracy during the tax years in question.

Particularly persuasive is the expert testimony presented by the plaintiff, establishing that technological advances in typewriter technology were destroying the value of correction fluid. The introduction of the IBM Correcting Selectric into the market, and the knowledge that the electronic typewriter and word processor would be the next advances, made it apparent in 1973 that the useful life of correction fluid and plaintiff's secret formula were limited. The advances in typewriter technology were rendering correction fluid obsolete; a typist's use of correction fluid declined by 55 to 80 percent when using a typewriter with a correctable ribbon; and the need for correction fluid was eliminated when using

electronic typewriters and word processors. Moreover, more than 90 percent of the plaintiff's business was in the office supply electric typewriter market, and this was the market that would be most quickly affected by the technological advances.

The plaintiff has also established by a preponderance of the evidence that the useful life of the secret formula could be estimated with reasonable accuracy. As stated earlier in the opinion, a "rough estimate" or "reasonable approximation" of useful life is sufficient. The testimony of the plaintiff's expert witness, Mr. Lyons, that in 1973 it would have been reasonable to predict that the useful life for correction fluid would end by the year 2000 satisfies the requirement of a "rough estimate." This court's predecessor, the Court of Claims, recognized that predictions of useful life can sometimes be based upon probable future technological developments. *Virginia Electric & Power Co. v. United States, supra,* 188 Ct.Cl. at 127, 411 F.2d at 1317. Mr. Lyons' testimony was not simply "some interesting crystal-ball gazing." *Id.* His estimate of useful life was based upon the typewriter replacement rate and took into account both the foreign and domestic markets and the office-supply and home-use markets. Of course, Mr. Lyons' predictions may not be fulfilled precisely as he testified. But his estimates are "sufficiently convincing that they may be classified as reasonable predictions of 'probable future developments,' which is all the regulations require in the context of this case." *Id.* (citing Treas.Reg. § 1.167(a)–1(b)).

The testimony of the defendant's expert, Dr. Greenberg, is unpersuasive because he attaches insufficient importance to the probable impact of technological advances on the useful life of correction fluid. Dr. Greenberg placed considerable emphasis on the plaintiff's increased total sales for the period following 1973. However, the fact that the plaintiff's sales of correction fluid products may have been in the growth stage in 1973 and in the immediately following years does not refute the prediction that, over the long term, technological development would render the product obsolete.

Moreover, it is reasonable to conclude that, as Mr. Bibby testified, much of the increase in the plaintiff's sales of correction fluid products following 1973 was due to plaintiff's efforts to exploit the correction fluid market before the inevitable decline. The defendant argues that these efforts, including the plaintiff's acquisition of more efficient machinery and the development of greater product and market diversity, contributed to the uncertainty of the length of the secret formula's product life. However, in the light of the profound impact of the projected technological developments, at least a "rough estimate" of useful life remains possible. Indeed, Mr. Lyons testified that because the new typewriter technology has been accepted at a faster rate than would have been predicted in 1973, he now believes that the useful life of correction fluid will end in 1995, sooner than would have been predicted in 1973. In fact, the plaintiff's sales figures indicate that domestic sales of plaintiff's basic white correction fluid product, No. 564, began to decline in 1981.

The expert witnesses disagreed as to when the plaintiff would discontinue sales of correction fluid products because of a declining market. Both Dr. Hofstedt and Mr. Lyons testified that a drop of 90 percent from the peak sales position of a product would probably cause a company to cease doing business in the product. On the other hand, Dr. Greenberg testified that because of the plaintiff's expansion into a diversified, multi-line product market, he did not believe that an eventual decline by the year 1995 to plaintiff's 1970 level of sales would cause the plaintiff to abandon its correction fluid products.

Of course, it cannot be known with certainty when the plaintiff would decide to cease production of its correction fluid products because of obsolescence. Nonetheless, it is reasonable to conclude, and the court finds, that technological advances in typewriter technology, which will destroy more than 90 percent of plaintiff's correction

fluid market by the year 1995, will terminate the useful life of the plaintiff's secret formula.

Because it is found that the plaintiff's secret formula had a limited useful life the length of which was reasonably ascertainable at the end of the tax years 1973, 1974, and 1975, it is determined that the plaintiff was entitled, for income tax purposes, to take a depreciation deduction based on the royalty payments made in the tax years 1973, 1974, and 1975 pursuant to the 1970 assignment.

In view of the determination made in the preceding paragraph, it is not necessary to consider the plaintiff's other contention, based on section 446 of the 1954 Code.

### Rate of Depreciation

In patent cases, the courts have recognized that when the purchase price of a patent is paid for on a yearly, percentage-of-production basis, the transferee may claim a depreciation deduction for the total amount of the annual royalty payments. *E.g., Associated Patentees, Inc. v. Commissioner,* 4 T.C. 979, 986–87 (1945); *Sarkes Tarzian, Inc. v. United States,* 159 F.Supp. 253, 268 (S.D.Ind.1958); *Newton Insert Co. v. Commissioner,* 61 T.C. 570, 586 (1974), *aff'd. per curiam,* 545 F.2d 1259 (9th Cir. 1976); *Omholt v. Commissioner,* 60 T.C. 541, 547 & n. 6 (1973); *Best Lock Corp. v. Commissioner,* 31 T.C. 1217, 1234 (1959); *see also* Rev.Rul. 67–136, 1967–1 C.B. 58. The deduction is allowed because the royalty payments accurately reflect the annual cost of the patent. The total cost is recovered over the useful life of the patent. Thus, there is a minimum distortion of income. *Newton Insert Co. v. Commissioner, supra,* 61 T.C. at 586; *Allied Chemical & Tube Corp. v. Commissioner,* 34 T.C.M. (CCH) 1218, 1225 (1975).

The rationale in the patent cases is applicable in this case. Accordingly, it is held that the plaintiff was entitled to depreciation deductions in the amounts of the 5 percent royalty payments made in the tax years 1973, 1974, and 1975 pursuant to the 1970 assignment.

### Summary

For the reasons stated in the opinion, it is found and determined that although the 1970 assignment of the secret formula to the plaintiff constituted a sale and not a license, and the royalty payments during the 1973–75 period under the assignment could not properly be deducted as ordinary and necessary business expenses, the secret formula had a limited useful life the length of which could be ascertained with reasonable accuracy, and, therefore, the plaintiff was entitled, for income tax purposes, to depreciation deductions for the 5 percent royalty payments made in the tax years 1973, 1974, and 1975 pursuant to the 1970 assignment.

### CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts as found by the court and stated in the opinion, the court concludes as a matter of law and decides that the plaintiff is entitled to recover, together with statutory interest. The amount of the recovery will be determined in subsequent proceedings under Rule 42(c).